JUDGE ROMAN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

LARRY W. JANDER, and all other individuals similarly situated,

**15 CV 03781**

Plaintiff,

**CLASS ACTION COMPLAINT**

v.

**JURY TRIAL DEMANDED**

INTERNATIONAL BUSINESS MACHINES CORPORATION, RETIREMENT PLANS COMMITTEE OF IBM, RICHARD CARROLL, MICHAEL SCHROETER, and ROBERT WEBER,



Defendants.

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff Larry W. Jander ("Plaintiff"), by and through his attorneys, files this Complaint on behalf of himself and other similarly situated current and former employees of International Business Machine Corporation ("IBM" or the "Company"), or its predecessor companies, who were participants in and beneficiaries of the IBM 401(k) Plus Plan (the "Plan") and who invested in the IBM Company Stock Fund (the "Fund") during the period of January 21, 2014 through October 20, 2014, inclusive (the "Class Period"). He alleges the following based on the investigation of his counsel, which included a review of the Plan's governing documents; the Plan's annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor ("DOL"); discussions with Plan participants; other SEC filings by IBM; other lawsuits against IBM; press releases and other public statements issued by IBM; and

media reports and analyses regarding IBM. Plaintiff believes that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

1.     This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against IBM, by participants in the Plan, and on behalf of the Plan, to recover many millions of dollars of damage suffered in their retirement accounts due to breaches of fiduciary duties owed to them. Fiduciaries of the Plan, who owed "the highest duty known to the law" to Plan participants, breached those duties throughout the Class Period when they knew that IBM's stock price had become artificially inflated in value, yet they took no action whatsoever to protect Plan participants from the harm this artificial inflation would inevitably cause.

2.     During the Class Period, IBM grossly overstated the value of its impaired Microelectronics business while it was up for sale, issued misleading financial results in its annual report for 2013 and quarterly reports during 2014, and gave false and misleading guidance about its prospective earnings and progress toward its transformation. These false and misleading statements, and IBM's failure to disclose critical, material information to the public, caused the market to improperly value IBM's stock price. When IBM finally came clean about the real value of the Microelectronics business, it had to write off $4.7 billion, and its stock price had plummeted to its true value, having dropped almost 20% from its Class Period high.

3.     The Plan is sponsored by IBM for eligible employees and is a defined contribution plan. This class action is brought on behalf of participants in the Plan who,

during the Class Period, invested in and/or held shares of the Fund—that is, IBM stock—through the Plan. Defendants in this case were all fiduciaries of the Plan, and per the requirements of the ERISA statute to which they were subject, they were responsible for monitoring and ensuring the prudence of the Plan's investments.

4.     IBM has endeavored to transform its business in light of a changing technology landscape, and has recently sought to shed some of its hardware businesses as they have grown less profitable. As early as 2013, IBM sought a buyer for the segment of its hardware business responsible for its Microelectronics business, which was responsible for the design and production of microchips. The Microelectronics business included long-lived property, plant, and equipment assets reflected on IBM's balance sheet at a value of approximately $2.4 billion.

5.     Unbeknownst to investors at the time, IBM was struggling to find a buyer for the Microelectronics segment, which had incurred a $700 million loss in 2013 and was on track for a similar loss in 2014. Based on these losses and IBM's fruitless early efforts to sell the business, IBM knew that the long-lived assets of the Microelectronics business were worthless, and that IBM would be lucky even to get $1 billion for this money-losing business segment (largely for the engineering expertise and intellectual property associated with it).

6.     Nevertheless, IBM misrepresented the value of its Microelectronics business and failed to disclose the segment's $700 million loss in 2013, thereby artificially inflating the Company's financial health. IBM's issuance of false financial results gave investors a misleading false picture of its financial condition, earnings guidance and the progress (or lack thereof) of its transformation.

3

7.     The truth finally emerged on October 20, 2014, when IBM announced an agreement to transfer its Microelectronics business to GlobalFoundries Incorporated ("GlobalFoundries") along with a $1.5 billion incentive payment by IBM. In conjunction with the announcement, IBM revealed that the Microelectronics business had lost more than $700 million in 2013, and that it expected comparable losses for 2014. IBM also disclosed that it had recorded a $4.7 billion charge, due in part to a $2.4 billion write-down of the entire value of the segment's long-lived property, plant, and equipment assets.

8.     In other words, IBM failed to disclose for almost a year that its Microelectronics business was hemorrhaging money and that IBM could not sell it without having to pay another company to take the failing business off its hands.

9.     At the beginning of the Class Period, on January 21, 2014, IBM's stock opened at $190.23. As it traded at artificially high prices throughout the Class Period, it rose as high as $196 a share. But when the truth was finally disclosed, IBM's share price fell dramatically on massive trading volume, dropping 7.11%, or $12.95 per share, from $182.05 per share at closing on October 17, 2014, to $169.10 on October 20, 2014. These price declines caused significant losses and damages to Plan participants who were invested in the Fund.

10.     The Plan fiduciaries knew that IBM's stock price had been artificially inflated by undisclosed material facts. All of the defendants were fiduciaries of the Plan and owed a fiduciary duty of prudence to Plan participants, and all of them were well-positioned not only to know that harm was being done to those participants, but to take action to prevent that harm. Specifically, defendants were all high-level corporate

4

insiders with firsthand knowledge of IBM's misleading disclosures to the market—and thus firsthand knowledge of the fact that IBM's stock price was artificially inflated.

11.     Moreover, as high-level corporate insiders with direct responsibility for IBM's financial disclosures, defendants were perfectly situated to correct those misleading disclosures and disclose the truth about IBM's Microelectronics business to the public.  Such disclosure to the public would also constitute, *ipso facto*, disclosure to Plan participants, and thus would have fulfilled defendants' fiduciary duty of prudence, which includes the duty to communicate truthfully with those to whom one's duty is owed.  In addition, such disclosure would have the curative effect of returning IBM's inflated stock price to its proper value, thus ensuring that Plan participants would not be further harmed by buying or holding artificially inflated IBM stock.  (Not to mention that such disclosure would allow IBM to comply with its obligations under the federal securities laws as well.)

12.     Defendants were also empowered by the documents governing the Plan to implement investment guidelines that could close the Fund to new purchases or otherwise prevent Plan participants from buying IBM at inflated prices—at least until the stock price was corrected (by defendants' disclosure of the truth to the public, one would hope).

13.     Defendants could not have reasonably believed that taking the above actions would do more harm than good to Plan participants.  Even if they were concerned that disclosure would negatively impact IBM's stock price, ERISA did not allow them to sanction an ongoing fraud.  Indeed, the truth about the Microelectronics business was going to come out sooner or later, and it is axiomatic that the longer it took to come out, the more devastating the impact on the stock price was going to be.  As fiduciaries with

duties under ERISA—not to mention as senior corporate officers with duties under the federal securities laws—defendants had an obligation to take action to ensure that IBM's stock price was returned to its true, uninflated value.

14.     Similarly, defendants could not have reasonably believed that taking action to ensure that Plan participants could not make new purchases while shares of the Fund were artificially inflated would cause more harm than good.  Simply preventing new purchases would not have constituted insider trading.  And if defendants felt obliged to disclose the fact of the freeze to the public, such a disclosure (a) would not have been prohibited by the securities laws and (b) might actually have encouraged defendants to make a fulsome disclosure to the public about IBM's Microelectronics business, which would be all to the good.

15.     Defendants allowed those to whom they owed their fiduciary duties to hold an imprudent investment throughout the Class Period without taking action to protect them in any way.  During that time, IBM's stock price went from approximately $190 per share to less than $170 per share, costing IBM's employees many millions of dollars in retirement savings.  Meanwhile, other investments in the Plan have fared far better, and IBM has struggled from the losses it reported and the damage to the Company's credibility.  Defendants, as fiduciaries, are directly responsible for this enormous harm that their breaches of their duties caused.

## I.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

17.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or defendant IBM is incorporated in New York and resides and maintains its primary place of business in this district.

18.     Specifically, this district is an appropriate venue for this action because the Plan's Forms 5500 filed with the Internal Revenue Service identify the address of the Plan as being in this district.  Additionally, it is likely that many of the parties and potential witnesses are located in, or are within close proximity to, this district.

## II.     PARTIES

19.     Plaintiff Larry W. Jander is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   Until March of this year, he was an employee of IBM, and he was and continues to be a participant in the Plan.  He purchased and held shares of the Fund in his Plan retirement savings account during the Class Period.

20.     Defendant IBM is a New York corporation with a principal office at New Orchard Road, MD 261, Armonk, New York 10504.  At all times, IBM is and was the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). Additionally, IBM is a *de facto* fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it had discretionary authority and control regarding the management of the Plan and/or the Plan's assets.  IBM's common stock is listed on the New York Stock Exchange, where it trades under the ticker symbol "IBM."

21.     Defendant Retirement Plans Committee of IBM (the "Committee") is a committee established by the governing documents of the Plan and is a "named

fiduciary" of the Plan according to those documents. It is comprised of the Chief Financial Officer ("CFO"), General Counsel ("GC") and Senior Vice President of Human Resources of the Company. (Plan § 1.17.) The Committee was a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

22.    Defendant Richard Carroll was Chief Accounting Officer of IBM as well as the Plan Administrator, and was therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

23.    Defendant Michael Schroeter was CFO of IBM and a member of the Committee, and was therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

24.    Defendant Robert Weber was GC of IBM and a member of the Committee, and was therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

### III.    THE PLAN

25.    The Plan is a defined contribution benefit plan that is sponsored by IBM for eligible employees and is subject to ERISA. Employees can defer up to 10% of their compensation into the Plan, and IBM will make an automatic contribution for some

8

employees and a matching or partial contribution based on length of service of up to six percent.

26.    The Plan's governing documents include the IBM 401(k) Plus Plan (As Amended and Restated effective as of January 1, 2008 with Amendments Adopted through December 2010), which sets forth, among other things, the identities of the "named fiduciaries" of the Plan and their powers and responsibilities with respect to the Plan.

27.    The Plan states that it has been "established ... to assist eligible employees in saving for retirement." (Preamble.) The Committee and the Plan Administrator are the "named fiduciaries" of the Plan. (Plan § 11.01.) The Plan Administrator and the Committee are permitted by the Plan to delegate to third parties "fiduciary responsibilities ... with the meaning of Section 405(c)(3) of ERISA", although even if they do so they continue to retain significant fiduciary powers. (Plan §§ 11.01(c), 11.03, 11.05.)

28.    Among the Committee's powers is the authority to appoint, retain and/or remove a third-party "Investment Manager" which will be responsible for the day-to-day oversight of the Plan's investment options, including the Fund. (Plan § 11.03(a)(i)(B).) (This power can also be delegated to "the IBM senior finance executive reporting to the [CFO].") Upon information and belief, a third-party "Investment Manager" had been retained and had been delegated oversight of Plan investment options, including the Fund, during the Class Period.

29.    Nevertheless, even if the Committee delegates oversight of the Plan investment options, including the Fund, to a third party, it continues to retain the power to

establish and amend "investment policies and guidelines for the Plan[.]" (Plan § 11.03(a)(ii).) It is also responsible for "the review of the performance of the Plan Administrator ... [and] the Investment Managers[.]" (Plan § 11.03(a)(iii).) And the Committee is responsible for "the establishment of such rules as it may deem appropriate for the conduct of its business with respect to the Plan." (Plan § 11.03(a)(iv).)

30.     Despite its seemingly ample ability to delegate its powers under the Plan, the Committee was still a fiduciary subject to ERISA, which forbids fiduciaries from offloading their duties onto others entirely, however much they might want to do so. Thus, when the Committee—particularly Committee members Schroeter and Weber— became aware of the artificial inflation of IBM's stock price, and the concomitant harm to Plan participants that this inflation would cause, they were still obligated under ERISA to use what powers they had under the Plan to protect those participants from harm. They could have done so in several ways.

31.     First, as senior corporate officers with direct responsibility for IBM's financial disclosures, defendants Schroeter and Weber could have effectuated truthful, corrective disclosures to the public regarding the Microelectronics business, thereby ameliorating the problem of artificial inflation and complying with their fiduciary obligation to tell the truth to Plan participants. Second, they could have used their Committee power of establishing investment guidelines to implement guidelines that would have prevented Plan participants from being able to purchase new shares of the Fund until such time as the artificial inflation of IBM's stock was corrected. Third, they could have disclosed their knowledge of the stock price's artificial inflation to their co-fiduciaries, including those to whom they delegated some or all of their fiduciary duties,

to enable those fiduciaries to take either or both of the aforementioned direct actions—disclosure and/or a freeze on new purchases—to protect Plan participants from further harm.

32.     The Plan Administrator, defendant Carroll, was also a "named fiduciary" of the Plan and had a variety of powers, including the power "to promulgate and enforce such rules and regulations as it shall deem necessary or appropriate for the administration of the Plan" (Plan § 11.05(a)), the power "to construe and interpret the Plan" (Plan § 11.05(b)), and the responsibility "to report to the Committee on its activities at such times as the Committee determines."   (Plan § 11.05(c).)   Like the Committee, Plan Administrator Carroll was permitted to delegate some of his responsibilities (Plan § 11.05(e)), but he continued to be subject to the requirements of ERISA and thus could not completely offload his fiduciary duties onto others.

33.     Thus, when he became aware of the artificial inflation of IBM's stock price and the harm that it was causing Plan participants, defendant Carroll could have taken action to protect Plan participants from further harm.  Given his senior accounting role, Carroll had considerable responsibility for the financial picture disclosed in IBM's public filings, including with respect to the Microelectronics business.  Thus, he could have made an effort to ensure that the finances of the Microelectronics business were accounted for and disclosed accurately, thus ensuring truthful communication with Plan participants and precluding further distortion of IBM's stock price.  And, like the members of the Committee, he could have disclosed his knowledge to his co-fiduciaries, including any others to whom he had delegated his fiduciary responsibilities, to enable them to take action (as set forth above) to protect Plan participants as well.

## IV.    THE FIDUCIARY BREACHES

### 1.  Background

34.    IBM is a global information technology company operating in five segments: (1) Global Technology Services, which primarily provides IT infrastructure services and business process services; (2) Global Business Services, which provides professional services and application management services; (3) Software, which consists primarily of middleware and operating systems software; (4) Systems and Technology, which provides business products requiring advanced computing power and storage capabilities; and (5) Global Financing, which invests in financing assets, leverages with debt, and manages the associated risks.

35.    The Systems and Technology Segment is focused on business products requiring advanced computing power and storage capabilities. Among other things, Systems and Technology provides hardware, including semiconductor technology, products, and packaging for other IBM units and external clients.

36.    IBM operated its Microelectronics business within its Systems and Technology Segment.  The Microelectronics business was primarily responsible for the design and production of microchips, and included assets such as plant, property, equipment, goodwill, manufacturing inventory, accounts receivables, and, notably, IBM's long-lived semiconductor manufacturing operations and facilities in East Fishkill, New York, and in Essex Junction, Vermont.

37.    It was IBM's Microelectronics business that included intellectual property on which the Company's success had once depended.  But, as the technology field has

changed, profits became harder to achieve, and the Microelectronics business began losing money.

38.     Since the mid-2000s, IBM has articulated a plan to divest the Company of hardware businesses in order to focus on higher growth areas.   In May 2007, the Company set out its "2010 Earnings Per Share ("EPS") Roadmap", which explained how IBM expected to achieve EPS growth of 14 to 16 percent, and $10 to $11 in EPS, by 2010.  At that time, the Company highlighted its strategy of exiting hardware businesses and strengthening its position in services and software.  IBM achieved and exceeded its 2010 Roadmap guidepost, recording EPS of $11.52 for 2010.

39.     During a May 2010 Investor Day, former IBM Chief Executive Officer ("CEO") Sam Palmisano set another EPS guidepost during a presentation, the "2015 Roadmap," which laid out IBM's plan to deliver EPS of at least $20 by 2015.  The 2015 Roadmap was described by the Company as leveraging the transformation of its base business, including divestitures from hardware and a shift to higher growth businesses, such that hardware and financing would decrease from 35% of operating segments profit in 2000 to 13% in 2015.

40.     Consistent with the plan set forth in the 2015 Roadmap, at least as early as 2013, IBM began looking for a buyer for the Microelectronics business.  IBM knew that the Microelectronics business was on track to incur a loss of $700 million in 2013 and a similar loss in 2014, and it wanted to unload the business in short order.

41.     IBM had difficulty locking in a buyer, so it appointed Goldman Sachs Group, Inc. ("Goldman Sachs") to try to find potential buyers for its Microelectronics business.  Even after the retention of Goldman Sachs, however, IBM was unable to find a

buyer willing to pay an amount even close to the value that it had listed on its books. IBM held talks with various chip makers regarding the sale of its Microelectronics business, including GlobalFoundries, Intel Corporation, and Taiwan Semiconductor Manufacturing Company.  Although IBM was asking for more than $2 billion for its Microelectronics business, bidders were unwilling to pay much more than $1 billion, and were primarily interested in acquiring IBM's engineering expertise and intellectual property, rather than the manufacturing facilities.  GlobalFoundries emerged as the leading candidate to buy IBM's semiconductor making operations, but noted outstanding issues concerning price and intellectual property.

42.     Under U.S. Generally Accepted Accounting Principles ("GAAP"), a company must recognize an impairment loss when the carrying cost of a long-lived asset is not recoverable and exceeds the asset's fair value.  Such assets must be reviewed for an impairment in value when facts or circumstances indicate that the carrying value may be greater than the sum of the undiscounted cash flows expected from the asset's use and disposal.

43.     Under accounting rules and the regulations established by the Sarbanes-Oxley Act of 2002, IBM was responsible for routinely assessing whether impairment indicators were present, and was required to have systems or processes in place to assist in the identification of potential impairment indicators.

44.     The 2013 operating losses in the Microelectronics business, as well as IBM's decision to sell the Microelectronics business, triggered impairment testing on the Microelectronics business.  The carrying value of the long-lived assets associated with

the business should have been impaired and reported no later than the quarter ended December 31, 2013—but it was not.

### 2. IBM's False Disclosures and Financial Reports

45.     Following the close of the markets on January 21, 2014, IBM issued a press release reporting its financial and operating results for the fourth quarter and full year ended December 31, 2013.  In the release, the Company "announced fourth-quarter 2013 diluted earnings of $5.73 per share, compared with diluted earnings of $5.13 per share in the fourth quarter of 2012, an increase of 12 percent" and "[o]perating (non-GAAP) diluted earnings [of] $6.13 per share, compared with operating diluted earnings of $5.39 per share in the fourth quarter of 2012, an increase of 14 percent."

46.     The press release stated in part, quoting CEO Rometty:

> We continued to drive strong results across much of our portfolio and again grew earnings per share in 2013.... As we enter 2014, we will continue to transform our business and invest aggressively in the areas that will drive growth and higher value. *We remain on track toward our 2015 roadmap for operating EPS of at least $20,* a step in our long-term strategy of industry leadership and continuous transformation.

47.     In conjunction with the announcement, IBM held a conference call after the market close on January 21, 2014, with analysts and investors to discuss earnings and operations.  Regarding earnings guidance for 2014, CFO Schroeter stated, in part:

> So I want to start out by saying that we continue to expect to deliver *at least $20 of operating EPS in 2015.*  We'll talk about 2014 a little later, and you'll see that our view of 2014 keeps us on track to that objective.
>
> * * *
>
> As always, we're positioning our business for the future.  And as I noted, we continue to expect to achieve *at least $20 in 2015 along the way.*
>
> * * *
>
> As we look forward to 2014, we'll continue our transformation, shifting our investments to the growth areas, and mixing to higher value.  We'll acquire key

capabilities. We'll divest businesses, and we'll rebalance our workforce as we continue to return value to shareholders.

Our current view of all of this is included in our expectation of *at least* $18 *of operating EPS in 2014.* That's up 10.5% from $16.2 in 2013.

We'll see the benefits of the first quarter rebalancing action later in the year. As a result, we expect our first quarter EPS to be about 14% of the full year, reflecting the modest gain, workforce rebalancing charge, and continued impact from currency. For these reasons, our first quarter skew in 2014 should be lower than our historical skew, which has been about 18% of the full year over the last few years.

And importantly, we expect to grow our free cash flow in 2014 by about $1 billion. That's faster than net income, even after absorbing another significant cash tax headwind, and growing capital expenditures. *All of this keeps us on track to our 2015 objective of at least $20 of operating EPS.*

48.     On February 25, 2014, IBM filed with the SEC an annual report on Form 10-K for the fourth quarter and full year ended December 31, 2013, which incorporated by reference the financial statements set forth in the 2013 Annual Report to Investors. In particular, the Annual Report stated that the consolidated financial statements were prepared in accordance with GAAP and included the following representations about IBM's accounting practices:

> *Long-lived assets, other than goodwill and indefinite-lived intangible assets, are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.* The impairment test is based on undiscounted cash flows and, if impaired, the asset is written down to fair value based on either discounted cash flows or appraised values.
>
> Goodwill and indefinite-lived intangible assets are tested annually, in the fourth quarter, for impairment and whenever changes in circumstances indicate an impairment may exist. Goodwill is tested at the reporting unit level which is the operating segment, or a business, which is one level below that operating segment (the "component" level) if discrete financial information is prepared and regularly reviewed by management at the segment level.

49.     The financial statements in the 2013 Annual Report contained representations regarding the operations of IBM's Systems and Technology Segment.

The Annual Reports stated that, for the Systems and Technology Segment: External Gross Profit was $5,120 and $6, 903 in 2013 and 2012 (in millions), and Gross Profit Margin was 35.6% and 39.1%.   The Annual Report then stated:

> Systems and Technology's gross profit margin decreased 5.5 points in the fourth quarter of 2013 versus the prior year.  The decrease was driven by lower margins in Power Systems (1.3 points), System x (1.2 points), Storage (0.6 points), Microelectronics (0.5 points) and a decline due to revenue mix (2.2 points). Systems and Technology's pre-tax income decreased $768 million or 78.8 percent in the fourth quarter, and pre-tax margin decreased 11.7 points versus the prior year period.

50.    IBM did not disclose any losses or impairment in the Microelectronics business which appears to have been profitable during 2013 for the Systems and Technology Segment, although with slightly lower margins.    There also was no disclosure made that the Microelectronics business had any substantial negative impact on the unit's overall business.

51.    After the close of trading on April 16, 2014, IBM issued a press release announcing its financial results for the first quarter of 2014, ended March 31, 2014. For the 2014 first quarter, the Company reported diluted earnings of $2.29 per share and operating (non- GAAP) diluted earnings of $2.54 per share.  CEO Rometty commented on the results, stating, in part:

> In the first quarter, we continued to take actions to transform part of the business and to shift aggressively to our strategic growth areas including cloud, big data analytics, social, mobile and security. . .

> As we move through 2014, we will begin to see the benefits from these actions. Over the long term, they will position us to drive growth and higher value for our clients.

52.     IBM held a conference call with analysts and investors following the earnings announcement on April 16, 2014.  Regarding the earnings guidance for 2014, CFO Schroeter stated, in part:

> For the year, we expect to deliver *at least* $18 *of operating earnings per share for 2014.*  This does not include any gain from the sale of our System x business to Lenovo because of the uncertainty of the timing and amount, but it will ultimately be included in our operating EPS results, and we'll update you later in the year.
>
> Like always, we manage our business and allocate capital for the long term, and along the way, we still expect to deliver *at least $20 of operating EPS in 2015.*
>
> * * *
>
> In terms of the $18, we said that we would get to at least $18.  We said in the first quarter that we would do about 14% of that, and that's where we came in, at 14%.
>
> * * *
>
> Given that quarterly phenomenon, a charge in the first quarter of this year but none the second versus the prior, we would think that the first half ... is going to look a lot like last year, and we'll probably get about 38% of our full year EPS done by the end of the first half.
>
> And then when we look at the second half, we'll see consistent growth with what we need on a full year basis at 10.5, and given the transactional nature and the momentum in some of our businesses, we would say it would probably be a little bit faster in the fourth than in the third.

53.     The First Quarter 2014 10-Q also contained representations regarding the operations of IBM's Systems and Technology segment.  The Quarterly Report stated that, for the Systems and Technology Segment: External Gross Profit was $645 and $1,003 in 2014 and 2013 (in millions), and Gross Profit Margin was 27% and 32.3%.  The Quarterly Report then stated:

> Systems and Technology's gross profit margin decreased 5.3 points in the first quarter of 2014 versus the prior year.  The decrease was driven by a decline due to revenue mix as a result of less mainframe content (2.3 points), lower margins in Power Systems (1.7 points), Microelectronics (1.3 points) and Storage (0.9 points), partially offset by higher margins in System z (0.2 points) and System x (0.1 points).

18

Systems and Technology's pre-tax loss increased $255 million to a loss of $660 million in the first quarter 2014, when compared to the prior year. Pre-tax margin decreased 13.2 points in the first quarter versus the prior year period. Normalized for workforce rebalancing charges of $218 million and $3 million in the first quarter of 2014 and 2013, respectively, Systems and Technology's first quarter pre-tax income was a loss of $442 million compared to a loss of $402 million in the prior year, and the pre-tax margin declined 4.8 points.

54.     On July 17, 2014, IBM issued a press release announcing its financial results for its 2014 second quarter ended June 30, 2014. For the 2014 second quarter, the Company reported diluted earnings of $4.12 per share and operating (non-GAAP) diluted earnings of $4.32 per share. CEO Rometty commented on the results, stating, in part:

In the second quarter, we made further progress on our transformation. We performed well in our strategic imperatives around cloud, big data and analytics, security and mobile . . . . We will continue to extend and leverage our unique strengths to address the emerging trends in enterprise IT and transform our business, positioning ourselves for growth over the long term.

55.     Following the earnings release, IBM held a conference call with analysts and investors to discuss its earnings and operations. During the conference call, CFO Schroeter made statements about the Company's earnings and outlook, stating, in part:

Let me spend a minute on the first-half performance. The revenue performance for the half is very similar to the second quarter. Through six months we had double-digit revenue growth in strategic initiatives, stable performance in our core franchises, and the impact of some secular trends in parts of hardware and from the divested business.

Looking at profit, we expanded gross margin 50 basis points, pretax margin by 70 basis points, and net margin by 50 basis points. All while shifting investment to key areas. Operating earnings per share for the first half were up 9.5%.

* * *

Systems and Technology revenue of $3.3 billion was down 11%. This is a significant improvement in the year-to-year performance compared to last quarter. The improvement was driven by system z, as well as sequential improvements in system x and storage. This, together with actions to align our structure to the demand profile, result[ed in] progress in stabilizing our profit.

56.     CFO Schroeter also spoke about IBM's 2014 earnings guidance, stating in

part:

> As we look to the full year of 2014, we expect to deliver *at least $18 of operating earnings per share and we still expect to deliver at least $20 of operating earnings per share in 2015.* These are points along the way to delivering performance, and shareholder value over the long term.
>
> * * *
>
> In the second half, we see . . . our software revenue growth accelerating to mid-single digit. And we see our services profit growth of mid-single digit driven by productivity in the base. And then on STG . . . , we see that profit stabilization still. So when I think about the second half, and how that plays out, as we said 90 days ago, ... I think EPS growth in the second half will be a little bit faster in the fourth than in the third. So kind of double-digit fourth quarter EPS and a single-digit third quarter EPS.
>
> And bear in mind that single-digit EPS growth even in the third, because of seasonality kind of translates to, no more absolute EPS than what we got in the second.

57.     On July 29, 2014, IBM filed its Form 10-Q for the quarter ended June 30,

2014 ("Second Quarter 10-Q"). The Quarterly Report stated that, for the Systems and

Technology Segment: External Gross Profit was $1,773 and $2,383 in 2014 and 2013 (in

millions), and Gross Profit Margin was 31% and 34.7%. The Third Quarter 10-Q also

contained representations regarding IBM's Systems and Technology Segment stating, in

part:

> Systems and Technology's gross profit margin decreased 2.8 points in the second quarter of 2014 versus the prior year. The decrease was driven by lower margins in Power Systems (1.1 points), Storage (0.9 points), Microelectronics (0.8 points) and System x (0.8 points), partially offset by an improvement due to revenue mix (0.4 points). Gross profit margin for the first six months of 2014 decreased 3.7 points compared to the first six months of 2013. The decrease was driven by lower margins in Power Systems (1.3 points), Microelectronics (1.0 points) and Storage (0.9 points), and a decline due to revenue mix (0.7 points).
>
> Systems and Technology's pre-tax income increased $166 million to $25 million in the second quarter and its pre-tax loss increased $89 million to $635 million for the first six months of 2014 compared to prior year periods. Pre-tax margin

increased 4.3 points in the second quarter and decreased 2.8 points in the first six months versus the prior year periods. Second-quarter performance reflects a year-to-year reduction in workforce rebalancing charges of $202 million.

The company's focus for STG in 2014 is to stabilize the profit base and, after the first half of the year, the company is on track. The company will continue to make investments in this business to remain a leader in high-performance, high-end systems. In July, the company announced it will invest $3 billion over the next five years to tackle the challenges of the "post-silicon" era, demonstrating its commitment to innovation and to leading in the new era of enterprise IT.

58.     The October 20, 2014 disclosures by IBM revealed that the statements made in its Annual and Quarterly Reports, earnings releases and on conference calls during 2014 were materially false and misleading when made because they misrepresented and failed to disclose adverse facts.

59.     The truth, which was known by IBM and its senior officers but concealed from the investing public and Plan participants during the Class Period, was that:

(1)     IBM's Microelectronics business incurred a loss of $700 million in 2013 and expected a comparable loss for 2014;

(2)     the long-lived assets of IBM's Microelectronics business were worthless;

(3)     IBM's operating results were materially inflated due to the improper failure to timely report a $2.4 billion impairment in the value of the assets of the Microelectronics business;

(4)     IBM and its officers lacked a reasonable basis for their representations that IBM was on track to achieve $18 per share in operating EPS in 2014;

(5)     IBM's financial statements were presented in violation of GAAP and were materially false and misleading;

(6)     IBM's annual and quarterly reports on Forms 10-K and 10-Q failed to disclose then-known events or uncertainties associated with IBM's Microelectronics business;

(7)     IBM's disclosure controls and internal controls over its financial reporting were materially deficient;

(8)     IBM's senior officers certifications about its disclosure controls and internal controls over its financial reporting were materially false and misleading; and

(9)     IBM and its senior officers lacked a reasonable basis for their positive statements about the Company, its business prospects, and future operating performance.

### 3.   IBM Reveals the Truth

60.     During the Class Period, IBM and its senior officers concealed a $700 million loss in the Microelectronics business in 2013 and the fact that the Company expected a comparable loss for 2014, and failed to timely record an impairment in the value of its long-lived assets of the Microelectronics business.  As a result, IBM's reported earnings and 2014 earnings guidance during the Class Period were artificially inflated and materially false and misleading—and IBM's stock price was consequently artificially inflated in value as well.

61.     On October 20, 2014, IBM issued startling disclosures that surprised investors and analysts and revealed the fraudulent misrepresentations and accounting misconduct.  Before the opening of trading that day, IBM and GlobalFoundries jointly announced that they had entered into a Definitive Agreement under which GlobalFoundries would acquire IBM's global commercial semiconductor technology, "including intellectual property, world class technologists and technologies related to IBM Microelectronics" for cash consideration of **$1.5 billion *to be paid to GlobalFoundries by IBM*.**  Under the agreement, GlobalFoundries would continue to supply semiconductors to IBM.

62.     The press release also announced that "IBM will reflect a pre-tax charge of $4.7 billion in its financial results for the third quarter of 2014, which includes an asset

impairment, estimated costs to sell the IBM microelectronics business and cash consideration to GlobalFoundries."

63.    Also on October 20, 2014, IBM issued a press release announcing its financial results for the third quarter ended September 30, 2014, reporting sales of $22.4 billion on continuing operations (excluding the Microelectronics business), down 4% from the third quarter of 2013, and operating profits of $3.68 per share, down 10% from the third quarter of 2013.

64.    IBM also reported that its gross profit margin from continuing operations on an operating basis was 49.2%, down 90 basis points from the third quarter of 2013. Total revenue from IBM's Systems and Technology segment, which includes semiconductor operations, declined 15%.

65.    The earnings release quoted CEO Rometty, who stated that "[w]e are disappointed in our performance."

66.    The release also stated the following regarding discontinued operations:

The loss from discontinued operations in the third quarter includes a non-recurring pre-tax charge of $4.7 billion, or $3.3 billion, net of tax. The charge includes an impairment to reflect fair value less estimated costs to sell the Microelectronics business assets, which the company has classified as held for sale at September 30, 2014. The charge also includes other estimated costs related to the transaction, including cash consideration expected to be transferred to GLOBALFOUNDRIES of approximately $1.5 billion. The cash consideration is expected to be paid to GLOBALFOUNDRIES over the next three years and will be adjusted by the amount of the working capital due by GLOBALFOUNDRIES to IBM, estimated to be $0.2 billion. In addition, discontinued operations include operational net losses from the Microelectronics business of $0.1 billion in both the third quarter of 2014 and the third quarter of 2013.

67.    During the October 20,2014 third quarter earnings conference call, CFO Schroeter stated the following regarding the Microelectronics business:

[T]he 2013 OEM revenue associated with the divested business was $1.4 billion, and *our STG segment included pre-tax losses for this business of over $700 million.* This is being reported as a discontinued operation. In the third quarter, [discontinued operations] will include both losses from the ongoing operations of about $90 million after tax, and a one-time after-tax charge of $3.3 billion associated with the transaction. The transaction had no impact to free cash flow in     the third quarter.

68.     CFO Schroeter also reduced 2014 guidance during the call, withdrawing the $20 operating EPS roadmap for 2015 and conceding that, rather than $18 EPS as promised in July, "full year 2014 Operating EPS [would] be down between 2 percent and 4 percent, that's off last year's comparable base of $16.64."

69.     During the question-and-answer portion of the call, analysts responded with surprise to the news. Goldman Sachs analyst Bill Shope observed, "Obviously there's a lot of new info here," and Barclays analyst Benjamin Reitzes commented, "We've just had obviously a major setback here."

70.     Brian White, a Cantor Fitzgerald analyst, asked about the newly released details on Microelectronics losses: "I just wanted to be clear. What did the chip business lose in 2013 and what are the expectations for loss in 2014?" Schroeter responded, in part, "[in] 2013 we had a loss of $700 million on a pretax basis. And 2014 is basically flat to what we saw in 2013."

71.     *The Wall Street Journal* also published commentary on the news, observing that it was a hit specific to IBM. The *Journal* stated that IBM's "results stood in contrast to Apple Inc., which on Monday posted a 13% profit increase on strong September sales of its larger-screen iPhones."

72.     In reaction to the disclosures, IBM's stock price declined more than $12.00 per share to close at $169.10 per share on October 20, 2014 on high trading

volume. IBM's stock price continued declining as the market absorbed the revelations, closing down at $163.23 per share on October 21, 2014 and $161.79 per share on October 22, 2014. In the end, the price of IBM stock declined approximately 19% from its Class Period high.

73.    On October 28, 2014, IBM filed its Form 10-Q for the quarter ended September 30, 2014. The Form 10-Q reported that, during the quarter, IBM wrote off the entire value of the assets of the Microelectronics business:

> In the third quarter, the company recorded a pre-tax charge of $4.7 billion related to the sale of the Microelectronics disposal group, which was part of the Systems and Technology reportable segment. The pre-tax charge was recorded to reflect the fair value less the estimated cost of selling the disposal group including *an impairment to the semiconductor long-lived assets of $2.4 billion,* $1.5 billion representing the cash consideration expected to be transferred to GLOBALFOUNDRIES and $0.8 billion of other related costs. The asset impairment was reflected in property, plant and equipment, net and the other costs of disposal were reflected in other accrued expenses and liabilities and other liabilities in the Consolidated Statement of Financial Position at September 30, 2014.

74.    As a result of the false statements during 2013, IBM's securities traded at artificially inflated levels during the Class Period. When IBM revealed the true value of its Microelectronics business and improper accounting practices, the price of IBM common stock fell to a value that was approximately 19% less than its Class Period peak.

75.    Prior to the start of the Class Period, IBM should have reduced the reported value of its Microelectronics business in its financial statements. Instead, IBM misrepresented the value of the Microelectronics business, materially inflating earnings and rendering earnings guidance materially misleading.

76.    Rather than properly testing and impairing the assets, during the Class Period, IBM assigned an approximately $2.4 billion carrying value to the

Microelectronics long-lived, property, plant, and equipment assets reflected in the financial statements it filed with the SEC and issued to investors, even though it knew the assets were worthless.

77.     The Microelectronics business lost $700 million in 2013, and it was on track for a similar loss in 2014. It was obvious that the Company would not be able to sell the Microelectronics business for more than $1 billion based only on the business's engineering expertise and intellectual property.

### 4. The Plan Fiduciaries' Knowledge and Breaches

78.     Throughout the Class Period, defendants were aware of these misleading statements and IBM's failures to disclose the truth about its Microelectronics business. Yet defendants did nothing to act upon that knowledge to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties.

79.     Defendant Schroeter was the CFO, a Sarbanes-Oxley co-signatory of IBM's SEC filings, and, indeed, was the person who actually made many of IBM's misleading statements. He would certainly have been aware of the Microelectronics business's 2013 performance, and, upon information and belief, he would have been directly involved in the efforts by Goldman Sachs to sell the failing business. Thus, he would have recognized that the Microelectronics business had performed terribly in 2013, but this performance had gone undisclosed. He would have known the expected performance of the business in 2014, and that this poor performance was also going undisclosed. And he would have known that the proper impairment and reporting with respect to the Microelectronics had not occurred as required by GAAP. Arguably, no person at IBM was more centrally involved in the Company's misrepresentations

regarding its Microelectronics business during the Class Period than Schroeter, and no person was better positioned to understand the effect that these misrepresentations were having on IBM's stock price.

80.     Defendant Weber, as GC, would also have played a central role in the preparation of IBM's financial reporting.  He was responsible for ensuring that that reporting complied with the federal securities laws, which of course require truth and accuracy in all financial reporting.   Unless Weber completely abdicated his responsibilities as GC during the Class Period, it is reasonable to infer that he was aware of IBM's false financial reporting, and thus its artificially inflated stock price.

81.     Defendant Carroll, as the senior-most accounting officer at IBM, would also have been centrally involved in the preparation of these financial statements, including with respect to what was and was not disclosed regarding the performance and value of the Microelectronics business.  Carroll in particular would have been attuned to the fact that an impairment of the business's long-lived assets should have been part of the accounting—and that it was not during the Class Period.

82.     Each of these individuals had a front row seat for IBM's misrepresentation of its Microelectronics business (Schroeter was arguably on the field).  And each was also a fiduciary of the Plan, charged under ERISA with ensuring the prudence of Plan investments, well aware that IBM stock was a popular Plan investment, and also aware that that popular investment had become an imprudent one.  Yet none of them took a single action to protect Plan participants from that imprudent and ultimately harmful investment.

83.     As members of the Committee, Schroeter and Weber had the power to issue new investment guidelines to the "Investment Manager" charged with overseeing Plan investments.  These guidelines could have specified that no purchases of the Fund be permitted until such time as the investment was no longer imprudent—i.e., when the stock price was no longer artificially inflated.

84.     The Committee also had the power to disclose the truth to the public and correct the artificial inflation, a power that it shared with the Plan Administrator, defendant Carroll.   Indeed, defendants Schroeter and Weber, as CFO and GC, respectively, were uniquely situated to fix this problem, inasmuch as they had primary responsibility for the public disclosures that had artificially inflated the stock price to begin with.  They could have stopped those misrepresentations from ever happening, or at least they could have corrected them much earlier than they were ultimately corrected. Either way, Plan participants' losses would have been mitigated, if not altogether prevented.

85.     Defendants cannot hide their inaction behind the securities laws.  In this situation, ERISA and the securities laws compelled defendants to take exactly the same action—tell the truth and correct the inflated stock price.  No law or duty required defendants to *prevent* the disclosure of the truth—quite the opposite.

86.     Defendants allowed those to whom they owed the "highest duties under law" to purchase Fund shares at an artificially high price during the Class Period, meaning that no matter what happened to IBM's stock price in the future—even if it recovered all of its losses and then some—they would be deprived of retirement money that otherwise would have rightfully been theirs. And Plan participants who simply held

Fund shares during the Class Period were injured as well, because they were prohibited from being able to invest in an alternative, prudent investment that would not have caused them the same losses that the Fund did during the Class Period. Millions upon millions of dollars were lost from the retirement accounts of IBM employees. Defendants, as fiduciaries, are directly responsible for this enormous harm that their breaches of duty caused.

## V.   CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of himself and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held the IBM Company Stock Fund at any time between January 21, 2014 and October 20, 2014, inclusive.

88.     Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

89.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are over 196,000 members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by IBM or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

90.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

91.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  Whether defendants each owed a fiduciary duty to the Plan, to plaintiff and to members of the Class;

    b.  Whether defendants breached fiduciary duties owed to the Plan, plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

    c.  Whether defendants failed to provide sufficient material disclosure to any and all Plan fiduciaries;

    d.  Whether defendants violated ERISA; and

    e.  The extent to which Class members have sustained damages and the proper measure of those damages.

92.     Plaintiff's claims are typical of the claims of the members of the Class because plaintiffs and the other members of the Class each sustained damages and/or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

93.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

94.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution

of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

95.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

96.    Plaintiff also brings this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

## COUNT I
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Against All Defendants)

97.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

98.    At all relevant times, as alleged above, all defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

99.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.

Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of such investments being imprudent.

100. A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

101. Defendants' duties of loyalty and prudence also obligate them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

102. Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, defendants knew that the Fund had become an imprudent investment for Plan participants' retirement savings because there was false

and misleading material information given to Plan participants and the public about the stock which artificially inflated its value.

103.    Accordingly, defendants should have taken appropriate responsive action by restricting transactions or new investments by the Plan in the Fund or by effectuating disclosures that would have corrected the stock price and rendered the Fund a prudent investment again.  Defendants also breached their duties by failing to provide complete and accurate information regarding IBM's accounting fraud in the valuation of the Microelectronics business, its losses and impairment, its false annual and quarterly earnings reports and its false and erroneous guidance.  As such, between January 21, 2014 and October 20, 2014, Plan participants could not appreciate the true risks presented by investments in IBM's stock and, therefore, could not make informed decisions regarding their investments.

104.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

**COUNT II**
**Failure to Adequately Monitor the Plan Fiduciaries and**
**Provide the Plan Fiduciaries with Accurate Information**
**(Against All Defendants)**

105.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

106.    At all relevant times, as alleged above, defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

107.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of defendants included the responsibility to appoint, evaluate, and monitor other Plan fiduciaries, including, but not limited to, any third-party "Investment Manager" to which certain fiduciary responsibilities were delegated.

108.    The duty to monitor entails ensuring that these other Plan fiduciaries each had truthful and accurate information to fulfill their respective jobs and duties as fiduciaries and to properly monitor, evaluate and oversee the Plan's investment in the Fund.

109.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and its assets.

110.    Defendants breached their fiduciary monitoring duties between January 21, 2014 and October 20, 2014 by failing to provide their co-fiduciaries and their fiduciary delegatees with truthful and accurate information concerning IBM's accounting fraud in the valuation of the Microelectronics business, its losses and impairment, its false annual and quarterly earnings reports and its false and erroneous guidance.

111.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.

34

112.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for:

A.    Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiff as class representative, and determining that plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.    Declaration that defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.    Declaration that defendants are not entitled to the protection of ERISA §404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.    An Order compelling defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

E.    Imposition a Constructive Trust on any amounts by which defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.      An Order enjoining defendants from any further violations of their ERISA fiduciary obligations;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

H.      An Order that defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in the IBM Company Stock Fund in proportion to the accounts' losses attributable to the decline in the price of its ADRs and/or the value of investment in alternative options under the Plan.

I.      Awarding the Plan and/or Plan participants rescission and/or money damages including pre-judgment interest;

J.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

K.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      An Order for equitable restitution and other appropriate equitable monetary relief against defendants.

M.      Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial

by jury is permitted by law.

By: _____

Samuel E. Bonderoff

Jacob H. Zamansky
Edward H. Glenn Jr.
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*samuel@zamansky.com*

ATTORNEYS FOR PLAINTIFFS