UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- :
                               :

LARRY W. JANDER, RICHARD J.      :
WAKSMAN, *and all other individuals*      :         15cv3781
*similarly situated*,      :
     :         <u>OPINION & ORDER</u>
                 Plaintiffs,      :
     :
                 -against-      :
     :
RETIREMENT PLANS COMMITTEE OF      :
IBM, *et al.*      :
     :
                 Defendants.      :
------------------------------------------- :

WILLIAM H. PAULEY III, United States District Judge:

          The Retirement Plans Committee of IBM, Richard Carroll, Martin Schroeter, and

Robert Weber (together, the "Defendants") move to dismiss the Second Amended Class

Complaint (the "Complaint"). For the following reasons, the Defendants' motion is granted.

BACKGROUND

          This stock-drop action arises from IBM's October 2014 announcement regarding

the sale of its Microelectronic business and a concomitant $2.4 billion write-down of its assets.[1]

Plaintiffs, as members of IBM's 401(k) Plus Plan (the "Plan") who invested in the IBM Stock

Fund (the "Fund"), allege that Defendants violated their fiduciary duties when they failed to

mitigate the foreseeable drop in IBM's stock and protect Plan members from losing millions of

dollars in retirement savings.

---

[1]      Familiarity with this Court's prior Opinions and Orders in <u>Int'l Assoc. of Heat & Frost Insulators & Asbestos Workers Local #6 Pension Fund v. Int'l Bus. Machs. Corp.</u>, 205 F. Supp. 3d 527 (S.D.N.Y. 2016) and <u>Jander v. Int'l Bus. Machs. Corp.</u>, 205 F. Supp. 3d 538 (S.D.N.Y. 2016), is presumed.

I.  Relevant Allegations

For purposes of this motion, the factual allegations in the Complaint are accepted as true.  The Plan is a defined contribution benefit plan sponsored by IBM toward which eligible employees may defer up to 10% of their compensation.  (Complaint ("Compl."), ECF No. 38, ¶ 44.)  Under the Plan's governing documents, the Retirement Plans Committee ("Committee") is a named fiduciary under the Employee Retirement Income Security Act ("ERISA").  (Compl. ¶ 40.)  Defendants Schroeter and Weber, as members of the Committee, along with Carroll, the Plan Administrator, are also named fiduciaries.  The Plan offered a suite of investment options that Plan participants could choose from, including the Fund, an employee stock option plan ("ESOP") that primarily invested in IBM stock.

In 2013, IBM began searching for a buyer to purchase its Microelectronics business, a division of its Systems and Technology Segment responsible for designing and producing microchips.  (Compl. ¶¶ 55, 59.)  IBM hired an investment bank to solicit offers from potential suitors but had difficulty finding a buyer.  (Compl. ¶¶ 59–60.)  While IBM was engaged in the search for a buyer, it continued to operate the Microelectronics business, making periodic disclosures to the market about its financial condition.

From January 21, 2014 to October 20, 2014 (the "Class Period"), IBM reported positive news and figures regarding the value of its Microelectronics business.  (Compl. ¶¶ 64–76).  In reality, however, IBM and Defendants concealed the truth—that the Microelectronics business was "a massive money-loser" whose continued operation had a "substantial negative impact" on the Systems and Technology Segment's overall business.  (Compl. ¶ 69.)  For nearly a year as IBM searched for a buyer, the Microelectronics business hemorrhaged money.  (Compl. ¶ 17.)

The effect of these misrepresentations—and IBM's failure to disclose the truth—had a dramatic, artificial impact on the value of IBM stock. During the Class Period, the stock price reached as high as $196 per share. (Compl. ¶ 18.) On October 20, 2014, IBM announced the sale of its Microelectronics business, startling the markets with news that it would pay the buyer $1.5 billion to take the asset off its hands. (Compl. ¶ 80.) The announcement also revealed that IBM had assigned a carrying value of approximately $2.4 billion to the Microelectronic business even though it knew the assets were worth significantly less. (Compl. ¶ 95.) On the heels of this news, IBM's stock price fell by 7.11% from $182.05 per share on Friday, October 17, 2014 to $169.10 on Monday, October 20, 2014. (Compl. ¶ 18.)

II.   Procedural History

In September 2016, this Court dismissed Plaintiffs' claims on grounds that their complaint failed to state a claim for breach of the duty of prudence. More specifically, Plaintiffs "fail[ed] to plead facts giving rise to an inference that Defendants could not have concluded that public disclosures, or halting the Plan from further investing in IBM stock, were more likely to harm than help the fund." Jander, 205 F. Supp. 3d at 545 (internal citations and quotations omitted).

This Court further held that in order to prevail on an ERISA claim, Plaintiffs must satisfy a "highly demanding pleading standard"—one under which a "rote recitation of proposed remedies without the necessary facts and allegations supporting Plaintiffs' proposition" would not suffice. Jander, 205 F. Supp. 3d at 546 (internal citation and quotation marks omitted). Plaintiffs argued that the Supreme Court's holding in Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459 (2014), set "an impossibly high barrier for ERISA breach-of-fiduciary duty cases concerning ESOPs," but this Court recognized that Dudenhoeffer merely sought to "clarif[y] the

3

standard by which courts need to evaluate such cases, [and] did not necessarily ease the standard." Jander, 2015 F. Supp. 3d at 546.

Notwithstanding dismissal of the first complaint, this Court afforded Plaintiffs another opportunity to re-plead their claims after "undertak[ing] the necessary due diligence to provide facts [with] greater specificity." Jander, 205 F. Supp. 3d at 546. Shortly after Plaintiffs filed their Complaint, Defendants again moved to dismiss.

DISCUSSION

I.    Standard

On a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 677. Nor does a complaint suffice if it offers "naked assertion[s]" devoid of "further factual enhancement." Iqbal, 556 U.S. at 678 (internal quotation marks omitted). The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (internal citations and quotations omitted).

Nevertheless, this Court must accept as true all well-pleaded allegations—including documents attached to the Complaint or incorporated by reference, and matters subject to judicial notice—and draw all reasonable inferences in Plaintiffs' favor. N.Y. Pet Welfare Assoc., Inc. v. City of N.Y., 850 F.3d 79, 86 (2d Cir. 2017); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (courts may consider "legally required public

4

disclosure documents filed with the SEC" and documents relied on by plaintiff "in bringing suit").

II.    Analysis

Plaintiffs offer three alternative actions that Defendants could have taken to mitigate the deleterious effects on IBM's stock price following the divestiture announcement. In their previous complaint, Plaintiffs alleged two alternative actions—that Defendants (i) could have made an earlier corrective disclosure to the market and (ii) could have halted all purchases and sales of IBM stock. They reiterate those alternatives and add a third in this Complaint, namely that Defendants could have purchased a hedging product to offset any losses to the Plan.

Under ERISA, an ESOP fiduciary owes the duty to act prudently "under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B). In other words, the duty of prudence is not evaluated from the "vantage point of hindsight." Roth v. Sawyer–Cleator Lumber Co., 16 F.3d 915, 918 (8th Cir. 1994). Therefore, to determine whether a fiduciary has acted prudently, courts must focus on the "fiduciary's conduct in arriving at an investment decision, not on its results, and ask whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt., 712 F.3d 705, 716 (2d Cir. 2012) (internal citations and quotation marks omitted). In doing so, "the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, [and] the appropriate inquiry will necessarily be context specific." Dudenhoeffer, 134 S. Ct. at 2471 (citing 29 U.S.C. § 1104(a)(1)(B)).

When a duty of prudence claim is alleged on the basis of nonpublic information, Dudenhoeffer dictates that "a plaintiff must plausibly allege an alternative action that the

defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." 134 S. Ct. at 2472. Dudenhoeffer signaled a sea change in ERISA law, namely because it eliminated the presumption of prudence previously afforded ESOP fiduciaries. 134 S. Ct. at 2467. Recognizing that removing this special presumption could open the doors to "meritless, economically burdensome lawsuits," the Supreme Court fashioned a pleading standard designed to "divide the plausible sheep from the meritless goats," which requires courts to undertake a "careful, context-sensitive scrutiny of a complaint's allegations." Dudenhoeffer, 134 S. Ct. at 2470.

A mere two years after Dudenhoeffer, the Supreme Court validated this exacting standard, directing lower courts to scrutinize the "facts and allegations supporting" a duty of prudence claim. Amgen Inc. v. Harris, 136 S. Ct. 758, 760 (2016). Dudenhoeffer did not impose a pleading standard different than that set forth in Twombly and Iqbal, but plaintiffs in ESOP duty of prudence cases have nonetheless struggled to satisfy it. The inherent nature of a duty of prudence claim—looking back to the relevant period to ascertain what a prudent fiduciary would have concluded—is necessarily context specific. Taking direction from Dudenhoeffer and Amgen, courts across the country have recognized that plaintiffs in ESOP prudence cases bear "the significant burden of proposing an alternative course of action so clearly beneficial that a prudent fiduciary could not conclude that it would be more likely to harm the fund than to help it." Whitley v. BP, P.L.C., 838 F.3d 523, 529 (5th Cir. 2016) (emphasis original); Jander, 205 F. Supp. 3d at 545 (noting the "highly demanding" and "highly exacting standard which is difficult to satisfy").

Here, the allegations in the Complaint fall short of the standard set forth in

Dudenhoeffer and Amgen. The Complaint is longer than its previous iteration, but much of it is

adorned with conclusory allegations aimed at advancing the general theory that Plaintiffs'

proposed alternative actions would have protected the Plan from its losses. Beyond a rote

explanation of how those alternative actions would have mitigated the harm, the Complaint is

bereft of context-specific details to show that a prudent fiduciary would not have viewed the

proposed alternatives as more likely to do more harm than good. Amgen, 136 S. Ct. at 760. This

Court turns to an analysis of each of Plaintiffs' proposed alternative actions.

A. Issuing Earlier Corrective Disclosure

Plaintiffs allege that Defendants "could have issued truthful or corrective

disclosures much earlier to cure the fraud and to make its stock a prudent investment again for

the Plan." (Compl. ¶ 104.) Employing this alternative could have "ended the artificial inflation

in IBM's stock price, which was damaging all purchasers through the Plan who paid excessive,

fraudulent prices for the stock." (Compl. ¶ 105.) That is all the more true, Plaintiffs claim, since

the Plan was a net buyer of approximately $111 million worth of IBM stock in 2014. (Compl. ¶

106).

While these allegations are plausible on a theoretical basis, they fail to shed any

light on whether a prudent fiduciary in Defendants' position under circumstances then prevailing

believed that a corrective disclosure would not have done more harm than good to the Fund. As

an initial matter, "courts have routinely rejected the allegation that the longer a fraud goes on, the

harsher the correction as support for corrective disclosure as a plausible alternative." Graham v.

Fearon, 2017 WL 1113358, at *5 (N.D. Ohio Mar. 24, 2017) (internal quotation marks and

citations omitted); JP Morgan Chase & Co. ERISA Litig., 2016 WL 110521, at *4 (S.D.N.Y Jan.

8, 2016), aff'd sub nom. Loeza v. John Does 1–10, 659 F. App'x 44 (2d Cir. 2016); Jander, 2016 WL 4688864, at *5 ("Plaintiffs' argument that delay in disclosing an alleged fraud always harms investors in the Plan is not particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence."). Plaintiffs' attempt to buttress that proposition with various academic articles and studies theorizing that the gap between a stock's true price and its artificial price—and the reputational damage to the stock's long-term investment value—continues to grow as the misrepresentations inflating the stock remain uncorrected. (Compl. ¶¶ 107, 109.) But offering these studies only underscores the general, theoretical, and untested nature of Plaintiffs' allegations.

Plaintiffs allege that the failure of IBM's share price to rebound in the aftermath of the company's October 2014 divestiture announcement validates the viability of making a corrective disclosure. Specifically, they assert that IBM's stagnant stock price two years after the divestiture announcement is evidence of the lingering reputational damage to IBM's stock as a long-term investment. (Compl. ¶ 27.) But aside from a number of intervening factors that could have contributed to a lethargic stock price, this argument rests on hindsight. Even if this Court credited this point, it says nothing about what a prudent fiduciary would have concluded under the circumstances then prevailing. See In re Target Corp. Sec. Litig., 2017 WL 3267708, at *19 (D. Minn. July 31, 2017) (theory as to duty of prudence based on hindsight is "insufficient to state a breach of the duty of prudence claim under ERISA, let alone meet Dudenhoeffer's standards.").

Plaintiffs advance one additional allegation that is remotely context specific—that the Fund was a net buyer of IBM stock, purchasing approximately $111 million in 2014. (Compl. ¶106.) A prudent fiduciary, they argue, would have saved unwitting buyers from a

steeper decline in the value of their stock even if certain "Plan participants who managed to sell at inflated prices" ultimately benefited. (Compl. ¶ 106.) And based on that, a prudent fiduciary would have concluded that "more harm than good to the Plan could not possibly be done by continuing to let the artificial inflation go uncorrected." (Compl. ¶ 106.) But this allegation omits sales of approximately $391 million of IBM stock during the same period that Plan participants purchased $111 million of stock. That turns the Fund into a net seller for the year. (Declaration of Lawrence Portnoy in Support of Motion to Dismiss, ECF No. 45, Ex. H, SEC Form 11-K for FY 2014.) This context-specific fact radically changes the analysis regarding what a prudent fiduciary would have concluded. With net sales eclipsing net purchases, it is entirely conceivable that a prudent fiduciary <u>could have</u> concluded that issuing an early corrective disclosure would do more harm than good.

Moreover, Plaintiffs' allegations merely track the theory of corrective disclosure—that releasing news of the fraud earlier would mitigate a precipitous drop in stock price following the divestiture announcement. (<u>See</u> Compl. ¶¶ 114–115, 118–119.) Plaintiffs offer no insight into how far the stock price would have dropped if disclosure was made earlier. More importantly, "<u>Dudenhoeffer</u> expressly instructs courts to consider whether publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price <u>and a concomitant drop</u> in the value of the stock already held by the fund." <u>In re BP P.L.C. Sec. Litig.</u>, 2017 WL 914995, at *5 (S.D. Tex. Mar. 8, 2017) (internal citation omitted and emphasis original). Thus, even if the stock price dropped marginally as a result of a corrective disclosure, the net effect of that drop on more than $110 million purchased by Plan participants could have been substantial.

Pleading these concepts requires more substance, which is why this Court, in allowing Plaintiffs to file the Complaint, presumed that they would "undertake the necessary due diligence to provide facts of this greater specificity, including those data regarding the Fund's Class Period purchases . . . and possibly retaining an expert to perform a quantitative analysis to show more precisely how Plan participants are harmed in the short and long term by purchasing Fund shares at artificially high prices."[2] Jander, 205 F. Supp. 3d at 546. But the Complaint offers no such analysis.

Beyond the absence of context specific allegations, however, the Complaint suffers from the failure to consider how a prudent fiduciary, when confronted with the inevitability of disclosing the impending sale of its Microelectronic business, would have accounted for the potential ill-effects resulting from a premature disclosure. "[G]iven the negative impact of disclosure, a prudent fiduciary could very easily conclude that such an action would do more harm than good." Graham, 2017 WL 1113358, at *5 (internal citation, emphasis, and alterations omitted); BP P.L.C., 2017 WL 914995, at *5 (plaintiffs "arguably underestimate[] the extent of the stock drop" because they fail to consider whether "an unusual disclosure by ERISA fiduciaries could 'spook' the market, causing a more significant drop in

---

[2]     But even that may not be enough. In BP P.L.C., to "quantify the hypothetical effect of making an [earlier disclosure]," the plaintiffs hired a financial markets expert who surmised a "3 to 5% decline from an early disclosure," which was substantially less than the 50% drop that actually occurred when BP's undisclosed safety risks materialized. 2017 WL 914995, at *5. Plaintiffs relied on this analysis to substantiate their contention that no prudent fiduciary could conclude that such a drop would be more harmful than "a late disclosure and/or catastrophic event, such as the Deepwater Horizon explosion and spill, that [ ] nearly eliminate[d] [their] investments." BP P.L.C., 2017 WL 914995, at *5. However, the BP P.L.C. court characterized those allegations as a "half-bubble off plumb" which "undervalue[d] the negative effects of early disclosure and overstat[ed] its benefit" because they failed to account for "a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." BP P.L.C., 2017 WL 914995, at *5 (emphasis original). Notwithstanding a projected modest decline in the stock price resulting from early disclosure, the court found that "a 5% decline" applied to the value of stock already held by the fund would result in a concomitant loss of "approximately $110 million in value." BP P.L.C., 2017 WL 914995, at *5. But here, Plaintiffs fail to articulate any numeric or comparative basis from which a prudent fiduciary could not conclude that early disclosure would do more harm than good.

price."); <u>Wilson v. Edison Int'l, Inc.</u>, 2016 WL 7469601, at *11 (C.D. Cal. July 6, 2016) (A "prudent fiduciary may consider that, if he erred in sparking market fears the decline could be far worse than what was actually warranted, and a prudent fiduciary would not so act."). "This is particularly true where an unusual disclosure outside the securities laws' normal reporting regime could spook the market, causing a more significant drop in price than if the disclosure were made through the customary procedures." <u>Graham</u>, 2017 WL 1113358, at *5. And in the context of this case, a prudent fiduciary may have considered whether a significant stock drop and its attendant publicity could spook potential buyers, especially during a time when IBM was struggling to attract serious offers for its Microelectronics business. (Compl. ¶ 60.)

Plaintiffs contend that no prudent fiduciary could have concluded that earlier disclosure would have done more harm than good, and urge this Court to take them at their word at this juncture in the litigation. But the whole point of <u>Dudenhoeffer</u> was to weed out meritless claims based on nothing more than Plaintiffs' <u>ipse dixit</u> assertions, and to encourage "careful judicial consideration" of alternative actions predicated on context-specific allegations that a prudent fiduciary under circumstances then prevailing would have weighed. Here, Plaintiffs give short shrift to <u>Dudenhoeffer</u>'s demands, only alleging in conclusory fashion that "in weighing harm versus good, [Defendants] should have concluded that [ ] a disclosure . . . would, in this case, be less harmful than waiting for the disclosure to happen through some other mechanism." (Compl. ¶ 118.)

B. <u>Halting Trading of IBM Stock</u>

Plaintiffs proffer a second alternative—that Defendants, who had the authority to issue new investment guidelines for the Plan, should have restricted new purchases and sales in the Fund. (Compl. ¶¶ 120–130.) While the Complaint sets forth a plausible reason as to why

11

this alternative was consistent with the securities laws (and would not constitute insider trading), it fails to allege that a prudent fiduciary could not have concluded that freezing stock purchases or sales would do more harm than good.

Plaintiffs gloss over the context-specific factors at play during the Class Period that a prudent fiduciary could have considered in determining whether halting the trading of IBM stock would do more harm than good. They reference on multiple occasions that the divestiture announcement caused a 7% decline in the stock value, and that Defendants were well-positioned to protect Plan participants from overpaying or provide them the opportunity to allocate their money toward other prudent alternative investment options under the Plan. (Compl. ¶¶ 129–130.) But these are the type of "naked assertions [ ] analogous to those the Supreme Court found insufficient in Amgen." Target, 2017 WL 3267708, at *17.

Moreover, the Complaint overlooks the possibility that halting trades "could send mixed signals," such as diminished confidence in IBM stock, "causing a drop in stock price" that could have done more harm than good to the Fund. Target, 2017 WL 3267708, at *17; In re Idearc ERISA Litig., 2016 WL 7189980, at *5 (N.D. Tex. Feb. 26, 2016) (complaint "does not address whether a prudent fiduciary might be concerned about other, more indirect effects" such as the possibility that the market "might take a plan's freeze of stock purchases as a sign that insider fiduciaries viewed the employer's stock as a bad investment."); In re Pilgrim's Pride Stock Inv. Plan ERISA Litig., 2016 WL 8814356, at *4 (E.D. Tex. Aug. 19, 2016) ("[S]imply terminating the Plaintiffs' option to invest in company stock would likely have signaled the market."). The Complaint does not clearly articulate a counter narrative as to why a prudent fiduciary would not have viewed this alternative as doing more harm than good.

C. <u>Purchasing a Hedging Product</u>

Finally, the Complaint asserts that purchasing a low-cost hedging product to offset any losses resulting from precipitous decline in stock price would not have done more harm than good. Plaintiffs allege that, in January 2013, Defendants were offered the option to "provide protection to Plan participants who were invested in IBM stock against the risk of an IBM stock price decline," but they rejected such a proposal after "virtually no consideration." (Compl. ¶ 131.) The Complaint also describes these "available hedging products" as low-cost alternatives "requir[ing] annual cash deposits of 1–2%." (Compl. ¶ 134.) Absent any losses triggering the hedge, "refunds of over half of the amount of annual contributions" would put the "cost of participation down to 0.10% per year." (Compl. ¶ 134.)

Beyond those allegations, however, the Complaint adds only surplusage to the contention that a hedging product would have been a better option than doing nothing. Defendants, as ESOP fiduciaries, have no duty to diversify since ESOPs, by their very nature, are intended to encourage stock ownership in one company. See <u>Dudenhoeffer</u>, 134 S. Ct. at 2467. But even if they chose to diversify through a hedging product, the Complaint alleges nothing about the specific parameters of such a hedge. At least some quantum of detail regarding the type, term length, and conditions of the hedging product is required to ascertain whether a prudent fiduciary during the Class Period would have determined that it could not do more harm than good to the Fund. <u>Graham</u>, 2016 WL 1113358, at *6 (finding allegations insufficient where no details about whether the hedging product was "a short position in [IBM] stock, an insurance product, or something else").

Plaintiffs give no consideration to the costs—and harm to the Fund—that could have been incurred from purchasing this generic hedging product. First, depending on its

13

parameters, the expense of obtaining a hedge may have outweighed its benefit. There is no telling how much the Fund would have been reimbursed, or protected, had a devastating disclosure such as the divestiture announcement triggered the hedge. The point of highlighting these deficiencies, however, is not that Plaintiffs were required to account for every detail and contingency. It is to underscore the need for some detail about an alternative action that a prudent fiduciary necessarily would have had to weigh and explore in making the ultimate determination that such action would not have done more harm than good to the Fund. The Complaint offers little from which this Court could conceive of such a result.

Second, like the other alternative actions, obtaining a hedging product may have required disclosure. Even if this Court accepted Plaintiffs' assurances that such a purchase would not require disclosure through a filing with the SEC or Department of Labor, Section 404 of ERISA mandates the Plan Administrator to provide Plan participants with notice of any "qualified change in investment options." See 29 U.S.C. § 1104(c)(4)(C). That would include investing in a hedging product on behalf of a Fund otherwise comprised of IBM stock. Such notice could have prompted questions about why a hedging product was necessary in the first place, "rais[ing] concerns in the broader market regarding the health of the Company or hasten the ultimately disclosure of the alleged" misrepresentations. Martone v. Robb, 2017 WL 3326966, at *4 (W.D. Tex. Aug. 2, 2017).

More troubling, this alternative may have invited Defendants to defraud a counterparty. If, for example, an insurer required Defendants to submit information about IBM, Defendants might have misrepresented the value of the Microelectronics business to conceal the reason they were seeking a hedge. That places a prudent fiduciary in a Catch-22. On the one hand, Plaintiffs complain that a prudent fiduciary should not have concealed the purported fraud

14

for as long as it did; on the other, they suggest a hedge should have been obtained under false pretenses to mitigate the inevitable harm resulting from the concealed fraud. This point further suggests that purchasing a hedge during the circumstances then prevailing may not have been a real possibility at all. And if it was—assuming a counterparty agreed to provide the hedge in spite of knowing about IBM's impending disclosure—a prudent fiduciary may have wondered whether it had just purchased a product whose benefits were illusory. These are all critical considerations that would have factored into a prudent fiduciary's calculus.

Fidelity to Dudenhoeffer's standard—to allege that a prudent fiduciary could not conclude that the alternative action would do more harm than good—requires a balancing of the countervailing outcomes to an alternative action under the circumstances. "In other words, in weighing the 'harm' and 'good' that would result from Plaintiffs' propos[ed] [alternative action]" such as early corrective disclosure, "a prudent fiduciary would have considered the harmful prospect of a stock drop that was imminent, substantial, and likely to occur." BP P.L.C., 2017 WL 914995, at *5. The ultimate burden is on the plaintiff to give some consideration to "other, more indirect effects" or the risks attendant to taking any given alternative action. Idearc, 2016 WL 7189980, at *6. Courts should not be left guessing "whether a prudent fiduciary might have perceived such a risk in this case." Idearc, 2016 WL 7189980, at *6. And while Plaintiffs should not be required to allege every conceivable positive or negative outcome to the alternative, they may "not simply allege that because a stock price drop was inevitable, ipso facto almost any legal alternative action aimed at softening losses to participants would do more good than harm." Target, 2017 WL 3267708, at *18.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is granted. The Clerk

of Court is directed to terminate the motion pending at ECF No. 43, and mark this case as closed.


Dated: September 29, 2017
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

16