## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LARRY W. JANDER, RICHARD J. WAKSMAN, and all other individuals similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RETIREMENT PLANS COMMITTEE OF IBM, RICHARD CARROLL, MARTIN SCHROETER, and ROBERT WEBER,<br><br>Defendants. | **FOURTH AMENDED CLASS ACTION COMPLAINT**<br><br>No. 1:15-cv-03781-WHP<br><br>JURY TRIAL DEMANDED |

## FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs Larry W. Jander and Richard J. Waksman ("Plaintiffs"), by and through their attorneys, file this fourth amended Complaint on behalf of themselves and other similarly situated current and former employees of International Business Machine Corporation ("IBM" or the "Company"), or its predecessor companies, who were participants in and beneficiaries of the IBM 401(k) Plus Plan (the "Plan") and who invested in the IBM Company Stock Fund (the "Fund") during the period of January 21, 2014 through October 20, 2014, inclusive (the "Class Period"). Plaintiffs allege the following based on the investigation of their counsel, which included a review of the Plan's governing documents; the Plan's annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor ("DOL"); discussions with Plan participants; other SEC filings by IBM; other lawsuits against IBM; press releases and other public statements issued by IBM; and media reports and analyses regarding IBM.

Plaintiffs believe that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against IBM, by participants in the Plan, and on behalf of the Plan, to recover many millions of dollars of damage suffered in their retirement accounts due to breaches of fiduciary duties owed to them. Fiduciaries of the Plan, who owed "the highest duty known to the law" to Plan participants, breached those duties throughout the Class Period when they knew that IBM's stock price had become artificially inflated in value, which made the Fund, which invested primarily in IBM stock, an imprudent investment under ERISA, thereby damaging the Plan and those Plan participants invested in the Fund.

2.      As fiduciaries, defendants had responsibility for the Plan's management, operations and investments. They breached their fiduciary duties to the Plan and its participants when they knew (or should have known) as high-level corporate insiders that IBM's stock price had become artificially inflated, yet they took no action whatsoever to protect the Plan or Plan participants from foreseeable resulting harm. They knowingly permitted Plan participants to purchase and hold an imprudent investment that was disqualified under ERISA as well as damaging to the Plan.

3.      Defendants were duty-bound to try to prevent, or at least mitigate, any damage caused by the artificial inflation to the Plan and its participants. They could have effectuated corrective, public disclosures to cure the artificial inflation consistent with the

requirements of the federal securities laws, thereby making IBM stock, and the Fund, an accurately priced, prudent investment again.

4.     Defendants could not reasonably have believed that taking this action would do more harm than good to the Plan or to Plan participants. IBM stock traded in an efficient market. As experienced senior executives, defendants were—or should have been— familiar with the rudimentary principles of how securities trade in efficient markets. Thus, they would have known that correcting the Company's artificial inflation would reduce IBM's stock price only by the amount by which it was artificially inflated to begin with. They had no basis to believe that any factor was distorting the market for IBM stock at the time—such as widespread short-selling or liquidity problems or the like—and thus no reason to fear that public correction of the Company's artificial inflation would reduce IBM's stock price to anything but its true, accurate value.

5.     Moreover, defendants knew or should have known that, the longer the artificial inflation of the stock of a public company like IBM persists, the harsher the correction is likely to be when that inflation is finally corrected. Economists have known for years that when a public company like IBM prolongs its stock's artificial inflation, the price correction when the truth emerges is that much harsher, because not only does the price have to be reduced by the amount of artificial inflation, but it is reduced by the damage to the company's overall reputation for trustworthiness as well. Some experts estimate that reputational damage can account for as much as 60% of the price drop that occurs when artificial inflation is corrected. This figure, however, increases over time. So, the earlier the inflation is corrected, the less reputational damage a company is likely to suffer.

3

6.     Such a consideration should have been in the forefront of defendants' minds when they learned that IBM's stock price was artificially inflated. The sooner they corrected that inflation, the less reputational damage the Company would suffer, and therefore the gentler the price correction would be. And in the long term, the Company's reputational trustworthiness would have been less undermined as well, making a swifter price recovery, and greater future gains, more likely. The effects of the harm to IBM's reputation can still be seen as more than a year later, as the Company's stock price has yet to recover from its significant decline following the disclosure of the real value of its Microelectronics business and the resulting $4.7 billion write off.

7.     The point is, defendants knew, or should have known, that no artificial inflation lasts forever. The federal securities laws arguably would have forced IBM to come clean with the public. And because defendants should also have known that the longer artificial inflation goes on, the more damage it does to investors—including Plan participants invested in the Fund—they should have recognized that acting as soon as possible to end the inflation could not have done the Plan or its participants more harm than good.

8.     During the Class Period, IBM grossly overstated the value of its impaired Microelectronics business while it was up for sale, issued misleading financial results in its annual report for 2013 and quarterly reports during 2014, and gave false and misleading guidance about its prospective earnings and progress toward its transformation. These false and misleading statements, and IBM's failure to disclose critical, material information to the public, caused the market to improperly value IBM's stock price. As a result, defendants, who knew that false and misleading statements were continuously made, also

knew that the Company's misrepresentations had artificially inflated the price of IBM stock throughout the Class Period. When IBM finally came clean about the real value of the Microelectronics business, it had to write off $4.7 billion, and its stock price had plummeted to its true value, having dropped almost 20% from its Class Period high.

9.     The Plan is sponsored by IBM for eligible employees and is a defined contribution plan. This class action is brought on behalf of participants in the Plan who, during the Class Period, invested in or held shares of the Fund—that is, IBM stock— through the Plan. Defendants in this case were all fiduciaries of the Plan, and per the requirements of the ERISA statute to which they were subject, they were responsible for monitoring and ensuring the prudence of the Plan's investments. Among the most important duties of the Plan fiduciaries was ensuring that each Plan investment option remained prudent—including the Fund. Notwithstanding any language in the Plan that attempted to take decision-making responsibility out of the hands of the Plan's fiduciaries, each Plan fiduciary was obliged under the law to ensure that investment of employee retirement funds in the Fund remained a prudent option based on what each fiduciary knew at the time. This responsibility to ensure the prudence of the Fund cannot be delegated or abnegated or otherwise avoided.

10.     IBM has endeavored to transform its business in light of a changing technology landscape, and it has recently sought to shed some of its hardware businesses as they have grown less profitable. Upon information and belief, in the early part of 2013, IBM first sought a buyer for the segment of its hardware business responsible for its Microelectronics business, which was responsible for the design and production of

microchips. The Microelectronics business included long-lived property, plant, and equipment assets reflected on IBM's balance sheet at a value of approximately $2.4 billion.

11.     Unbeknownst to investors at the time, IBM was trying to find a buyer for the Microelectronics segment, which had incurred a $720 million loss in 2013 and was on track for a similar or greater loss in 2014.

12.     Indeed, IBM had known since it began seeking a buyer for the Microelectronics business in early 2013 that it was more than likely that the business segment would be sold. Based on Microelectronics' outsize losses in 2013 and 2014 and IBM's efforts in 2013 to try to sell the business, IBM knew or should have known that the long-lived assets of the Microelectronics business were at least substantially impaired, and impairment testing had become necessary.

13.     Nevertheless, IBM failed to record the required impairment, which should have been done at least by the end of 2013, when the $720 million loss was recorded and IBM had spent the better part of year trying to find a buyer for Microelectronics. In fact, considering that Microelectronics recorded a loss of $638 million in 2012, IBM should have done impairment testing as soon as it started looking for a buyer in early 2013 in light of the prior year's substantial loss and the strong likelihood of a future sale of the business's assets.

14.     Yet IBM did not do any of this. Instead, it misrepresented the value of its Microelectronics business, thereby spuriously enhancing the Company's financial health. IBM's issuance of false financial results gave investors a misleading picture of its financial condition, earnings guidance and the progress (or lack thereof) of its transformation.

15.     The truth finally emerged on October 20, 2014, when IBM announced an agreement to transfer its Microelectronics business to GlobalFoundries Incorporated ("GlobalFoundries") along with a $1.5 billion incentive payment by IBM. In conjunction with the announcement, IBM revealed that the Microelectronics business had lost more than $720 million in 2013, and that it expected comparable losses for 2014 (over $600 million for the first three quarters of 2014). IBM also disclosed that it had recorded a $4.7 billion charge, due in part to a $2.4 billion write-down of the entire value of the segment's long-lived property, plant, and equipment assets.

16.     In other words, IBM failed to disclose for almost a year that its Microelectronics business was hemorrhaging money and that IBM could not sell it without having to pay another company $1.5 billion to take the failing business off its hands.

17.     At the beginning of the Class Period, on January 21, 2014, IBM's stock opened at $190.23. As it traded at artificially high prices throughout the Class Period, it rose as high as $196 a share. But when the truth was finally disclosed, IBM's share price fell dramatically on massive trading volume, dropping 7.11%, or $12.95 per share, from $182.05 per share at closing on October 17, 2014, to $169.10 on October 20, 2014. These price declines caused significant losses and damages to Plan participants who were invested in the Fund.

18.     The Plan fiduciaries knew or should have known that the Fund had become imprudent during the Class Period due to undisclosed material facts that had artificially inflated IBM's stock price. All of the defendants were fiduciaries of the Plan and owed a fiduciary duty of prudence to Plan participants, and all of them were well-positioned not only to know that harm was being done to those participants, but to take action to prevent

that harm. Specifically, defendants were all high-level corporate insiders with firsthand knowledge of IBM's misleading disclosures to the market—and thus firsthand knowledge of the fact that IBM's stock price was artificially inflated.

19.    Based on their knowledge, defendants were duty-bound by ERISA to prevent harm to the Plan and its participants from undisclosed and/or false material information which they knew made the Fund an imprudent investment for retirement purposes. They knew that the Plan was harmed with every purchase of the Fund made at inflated prices, and that the Plan's large holdings of IBM stock were at risk for a sizeable downward price correction when the truth emerged. They also knew that any scandal revelation would damage IBM's long term confidence with investors, and that the damage would be worse the longer it lasted.

20.    Defendants, as high-level corporate insiders with direct responsibility for IBM's financial disclosures, could have issued truthful or corrective disclosures to cure the artificial inflation and make IBM's stock a prudent investment again as they were required to do to fulfill their fiduciary duty.

21.    As fiduciaries, defendants were required to act to prevent the ongoing present and future damage to the Plan from the artificial inflation, and not to conceal it from the Plan participants. Defendants cannot have reasonably believed that there would be "more harm than good" to the Plan or its participants from acting to prevent the artificial inflation or the damage caused by it.

22.    The Plan participants who chose to purchase the Fund paid excessive prices for the stock during the Class Period. They suffered concrete financial harm to their retirement savings by over-paying for IBM stock which, defendants knew, or should have

known, would fall sharply in value when the truth came out and the stock corrected. When the artificial inflation was revealed, IBM's stock fell by more than 7%, or $12.95 per share. The Plan participants who purchased IBM stock were damaged by overpaying this amount, and they bore this foreseeable loss which could have been avoided. No matter what happens to the stock price in the future, these Plan participants sustained a loss due to paying the excessive artificial price, and they will bear this loss even if IBM stock recovers in the future. Defendants should have acted to end and prevent this concrete, present harm to the Plan, and no harm would have resulted from their action.

23.     Additionally, defendants could not have reasonably believed that effectuating truthful, corrective disclosure would do "more harm than good" to the Plan or its participants. In other words, defendants simply could have told the public the truth. Again, defendants were well-positioned to take this step. After all, who better than the high-level corporate insiders with direct responsibility for IBM's financial disclosures to effectuate truthful and accurate financial reporting to the public? The participation of the fiduciaries in a concealment effort that deceives the Plan participants runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed. At a minimum, defendants had the fiduciary obligation to disclose the truth to correct the artificial inflation of IBM's stock.

24.     Truthful disclosure was also needed to prevent worse future harm to the Plan and IBM's stock price. Defendants may argue that they were concerned that correcting the artificial inflation would temporarily lower the stock price, but that concern should not have deterred disclosing the truth. Every stockartificial inflation in history, when corrected, has resulted in a temporary drop in the stock price; that is an inherent quality of efficient

markets.  But, in virtually every such case, the longer the artificial inflation persists, the harsher the correction tends to be, usually because a prolonged inflation necessarily means that long-term damage is also done to a company's reputation for trustworthiness. Defendants should have disclosed the truth sooner rather than later to minimize the ongoing harm (to prevent further artificial inflation and purchases at excessive prices), as well as worse future damage to IBM's stock price. The reputational harm to IBM is still being felt by shareholders over two years later; the Company's stock price has yet to recover from its significant decline following the disclosure of the real value of its Microelectronics business and the resulting $4.7 billion write off. Additionally, IBM's management suffered greater damage to its credibility the longer the artificial inflation went on. Therefore, "more harm" was done from non-disclosure, than good.

25.    Consider that, on the date of the disclosure discussed *infra*, IBM's stock price declined $12.95 per share, or over 7%, to close at $169.10 per share on October 20, 2014. Two years later, on October 20, 2016, IBM stock opened trading at $151.28 per share; in other words, the stock price has yet to recover from the later disclosure. Thus, had the fiduciaries corrected the artificial inflation sooner, the ongoing harm would have been lessened, and a recovery, or at least the start of one, would have been more likely.

26.    Defendants' inaction towards the artificial inflation caused far greater harm to the Plan that is substantial, and not merely theoretical harm, but concrete damage. The longer that IBM's artificial inflation of its stock price went on, the more Plan purchasers bought at artificially inflated prices, and the size of the harm to each purchaser increased over time as the stock price inflated. As a result, IBM's stock had farther to fall when the

truth inevitably came out, so that the purchasers were hurt even worse as the result of choosing to invest in IBM stock.

27.    The Plan holders of IBM shares suffered greater harm and damage in this same manner from defendants' failure to end the artificial inflation. While they held IBM shares over the period of time when the stock price was artificially appreciating in value, they were deceived by the false growth.  They suffered greater losses when IBM's stock price corrected, and fell further due to the loss of management credulity. They also were deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place. Most important, holders suffered a harsher correction than they would have had defendants acted in a timelier fashion.

28.    Additionally, defendants' issuance of corrective disclosure was arguably required by the federal securities laws. By the very same mechanism that IBM could have used to make corrective disclosures to the general public under the federal securities laws, it could also have made disclosures to Plan participants, because Plan participants are, after all, part of the general public. For example, defendant Schroeter made public statements during IBM's conference calls, and he certified IBM's annual reports, so he could easily have effected the necessary truthful disclosures. Defendants did not have to make a "special" disclosure only to Plan participants, but could simply have made one corrective disclosure to the world and thereby simultaneously satisfied their obligations under the federal securities laws and ERISA.

29.    Indeed, earlier disclosure by IBM would have affirmatively benefitted the Plan and its participants, as well as mitigated the harm. With the truth about the real value

of IBM's Microelectronics business, which later resulted in a $4.7 billion write-off, Plan participants could properly evaluate the Fund versus their other investment alternatives for their retirement savings. Plan participants considering new purchases with their annual contributions could select healthier, prudent investment options such as diversified mutual funds which outperformed IBM stock during the Class Period. And over the long term, the failures to act by the Plan fiduciaries to expose corporate misconduct is likely to have a chilling effect on future purchases of the Fund by Plan participants, whose trust in their employer is inevitably eroded by this malfeasance. Such an effect constitutes a net harm to the Plan.

30.     But defendants did not take these steps. Instead, they breached their fiduciary duties to the Plan and Plan participants. Defendants knew of the misvaluation of IBM's Microelectronics business, that the Company's financial results were false and misleading, and that its stock price was artificially inflated and imprudent. Yet, Defendants failed to restrict new purchases of the Fund by the Plan or make corrective disclosures so that its Plan participants were harmed by overpaying for imprudent stock at artificially inflated prices, and were denied the opportunity to make informed alternative investments.

31.     Instead, defendants allowed their employee Plan participants to whom they owed their fiduciary duties to purchase and hold an imprudent investment throughout the Class Period without taking action to protect them in any way.  During that time, IBM's stock price went from approximately $190 per share to less than $170 per share, costing IBM's employees many millions of dollars in retirement savings. Meanwhile, other investments in the Plan have fared far better, and IBM faces lawsuits, significant losses of once dominated markets, and a struggle to repair the serious damage to its reputation and

credibility. Defendants are directly responsible as fiduciaries for the enormous harm that their breaches of their duties caused.

## II.     JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

33.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or defendant IBM is incorporated in New York and resides and maintains its primary place of business in this district.

34.     Specifically, this district is an appropriate venue for this action because the Plan's Forms 5500 filed with the Internal Revenue Service identify the address of the Plan as being in this district. Additionally, it is likely that many of the parties and potential witnesses are located in, or are within close proximity to, this district.

## III.     PARTIES

35.     Plaintiff Larry W. Jander is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Until March of 2015, he was an employee of IBM, and he was and continues to be a participant in the Plan. He purchased and held shares of the Fund in his Plan retirement savings account during the Class Period.

36.     Plaintiff Richard J. Waksman is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). He worked at IBM for more than 30 years, and he was and continues to be a participant in the Plan. He purchased and held shares of the Fund in his Plan retirement savings account during the Class Period.

37.     Defendant Retirement Plans Committee of IBM (the "Committee") is a committee established by the governing documents of the Plan and is a "named fiduciary" of the Plan according to those documents. It is comprised of the Chief Financial Officer ("CFO"), General Counsel ("GC") and Senior Vice President of Human Resources of the Company. (Plan § 1.17.) The Committee was a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

38.     Defendant Richard Carroll was Chief Accounting Officer of IBM as well as the Plan Administrator, and was therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

39.     Defendant Martin Schroeter was CFO of IBM and a member of the Committee, and was therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

40.     Defendant Robert Weber was GC of IBM and a member of the Committee, and was therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

## IV.     THE PLAN

41.     The Plan is a defined contribution benefit plan that is sponsored by IBM for eligible employees and is subject to ERISA. Employees can defer up to 10% of their compensation into the Plan, and IBM will make an automatic contribution for some

employees and a matching or partial contribution based on length of service of up to six percent.

42.     The Plan's governing documents include the IBM 401(k) Plus Plan (As Amended and Restated effective as of January 1, 2008 with Amendments Adopted through December 2010), which sets forth, among other things, the identities of the "named fiduciaries" of the Plan and their powers and responsibilities with respect to the Plan.

43.     The Plan states that it was "established … to assist eligible employees in saving for retirement." (Preamble.) The Committee and the Plan Administrator are the "named fiduciaries" of the Plan. (Plan § 11.01.) The Plan Administrator and the Committee are permitted by the Plan to delegate to third parties "fiduciary responsibilities … with the meaning of Section 405(c)(3) of ERISA", although even if they do so they continue to retain significant fiduciary powers. (Plan §§ 11.01(c), 11.03, 11.05.)

44.     Among the Committee's powers is the authority to appoint, retain or remove a third-party "Investment Manager" responsible for the day-to-day oversight of the Plan's investment options, including the Fund. (Plan § 11.03(a)(i)(B).) (This power can also be delegated to "the IBM senior finance executive reporting to the [CFO].") Upon information and belief, a third-party "Investment Manager" had been retained and had been delegated oversight of Plan investment options, including the Fund, during the Class Period.

45.     Nevertheless, even if the Committee delegates oversight of the Plan investment options, including the Fund, to a third party, it continues to retain the power to establish and amend "investment policies and guidelines for the Plan[.]" (Plan § 11.03(a)(ii).) It is also responsible for "the review of the performance of the Plan Administrator … [and] the Investment Managers[.]" (Plan § 11.03(a)(iii).) And the

Committee is responsible for "the establishment of such rules as it may deem appropriate for the conduct of its business with respect to the Plan." (Plan § 11.03(a)(iv).)

46.     Despite its seemingly ample ability to delegate its powers under the Plan, the Committee was still a fiduciary subject to ERISA, which forbids fiduciaries from offloading their duties onto others entirely, however much they might want to do so. Thus, when the Committee—particularly Committee members Schroeter and Weber—became aware of the artificial inflation of IBM's stock price, and the concomitant harm to Plan participants that this inflation would cause, they were still obligated under ERISA to use what powers they had under the Plan to protect those participants from harm. They could have done so in several ways.

47.     As senior corporate officers with direct responsibility for IBM's financial disclosures, defendants Schroeter and Weber could have effectuated truthful, corrective disclosures to the public regarding the Microelectronics business, thereby ameliorating the problem of artificial inflation and complying with their fiduciary obligation to tell the truth to Plan participants.

48.     The Plan Administrator, defendant Carroll, was also a "named fiduciary" of the Plan and had a variety of powers, including the power "to promulgate and enforce such rules and regulations as it shall deem necessary or appropriate for the administration of the Plan" (Plan § 11.05(a)), the power "to construe and interpret the Plan" (Plan § 11.05(b)), and the responsibility "to report to the Committee on its activities at such times as the Committee determines." (Plan § 11.05(c).) Like the Committee, Plan Administrator Carroll was permitted to delegate some of his responsibilities (Plan § 11.05(e)), but he continued

to be subject to the requirements of ERISA and thus could not completely offload his fiduciary duties onto others.

49.     Thus, when he became aware of the artificial inflation of IBM's stock price and the harm that it was causing Plan participants, defendant Carroll could have taken action to protect Plan participants from further harm. Given his senior accounting role, Carroll had considerable responsibility for the financial picture disclosed in IBM's public filings, including with respect to the Microelectronics business. Thus, he could have made an effort to ensure that the finances of the Microelectronics business were accounted for and disclosed accurately, thus ensuring truthful communication with Plan participants and precluding further distortion of IBM's stock price. And, like the members of the Committee, he could have disclosed his knowledge to his co-fiduciaries, including any others to whom he had delegated his fiduciary responsibilities, to enable them to take action (as set forth above) to protect Plan participants as well.

## V.     THE FIDUCIARY BREACHES

### A.  Background

50.     IBM is a global information technology company operating in five segments: (1) Global Technology Services, which primarily provides IT infrastructure services and business process services; (2) Global Business Services, which provides professional services and application management services; (3) Software, which consists primarily of middleware and operating systems software; (4) Systems and Technology, which provides business products requiring advanced computing power and storage capabilities; and (5) Global Financing, which invests in financing assets, leverages with debt, and manages the associated risks.

51.     The Systems and Technology Segment is focused on business products requiring advanced computing power and storage capabilities. Among other things, Systems and Technology provides hardware, including semiconductor technology, products, and packaging for other IBM units and external clients.

52.     IBM operated its Microelectronics business within its Systems and Technology Segment. The Microelectronics business was primarily responsible for the design and production of microchips, and included assets such as plant, property, equipment, goodwill, manufacturing inventory, accounts receivables, and, notably, IBM's long-lived semiconductor manufacturing operations and facilities in East Fishkill, New York, and Essex Junction, Vermont.

53.     IBM's Microelectronics business included intellectual property on which the Company's success had once depended. But, as the technology field changed, profits became harder to achieve, and the Microelectronics business began losing money.

54.     Since the mid-2000s, IBM has articulated a plan to divest the Company of hardware businesses to focus on higher growth areas. In May 2007, the Company set out its "2010 Earnings Per Share ("EPS") Roadmap," which explained how IBM expected to achieve EPS growth of 14 to 16 percent, and $10 to $11 in EPS, by 2010. At that time, the Company highlighted its strategy of exiting hardware businesses and strengthening its position in services and software. IBM achieved and exceeded its 2010 Roadmap guidepost, recording EPS of $11.52 for 2010.

55.     During a May 2010 Investor Day, former IBM Chief Executive Officer ("CEO") Sam Palmisano set another EPS guidepost during a presentation, the "2015 Roadmap," which laid out IBM's plan to deliver EPS of at least $20 by 2015. The 2015

18

Roadmap was described by the Company as leveraging the transformation of its base business, including divestitures from hardware and a shift to higher growth businesses, such that hardware and financing would decrease from 35% of operating segments profit in 2000 to 13% in 2015.

56.     Consistent with the plan set forth in the 2015 Roadmap, upon information and belief, in early 2013, IBM began looking for a buyer for the Microelectronics business. IBM knew that the Microelectronics business was on track to incur a loss of $700 million in 2013 and a similar loss in 2014, and it wanted to unload the business in short order.

57.     As part of its efforts, IBM appointed Goldman Sachs Group, Inc. ("Goldman Sachs") to try to find potential buyers for its Microelectronics business. IBM was unable to find a buyer willing to pay an amount even close to the value that it had listed on its books, although it nevertheless continued in its efforts with Goldman Sachs to try to sell the Microelectronics business. IBM held talks with various chip makers regarding the sale of its Microelectronics business, including GlobalFoundries, Intel Corporation, and Taiwan Semiconductor Manufacturing Company. Although IBM was asking for more than $2 billion for its Microelectronics business, bidders were unwilling to pay that price, and were completely uninterested in the business's outmoded and dilapidated manufacturing facilities. Eventually, GlobalFoundries emerged as the leading candidate to buy IBM's semiconductor-making operations.

58.     Under U.S. Generally Accepted Accounting Principles ("GAAP"), a company must recognize an impairment loss when the carrying cost of a long-lived asset is not recoverable and exceeds the asset's fair value. Such assets must be reviewed for impairment in value when facts or circumstances indicate that the carrying value may be

greater than the sum of the undiscounted cash flows expected from the asset's use and disposal. Similarly, a long-lived asset—or, in this case, asset group—should be tested for impairment where a company has "a current expectation that, more likely than not, [the asset group] would be sold or otherwise disposed of significantly before the end of its previously estimated useful life[.]"

59.     Under accounting rules and the regulations established by the Sarbanes-Oxley Act of 2002, IBM was responsible for routinely assessing whether impairment indicators were present, and was required to have systems or processes in place to assist in the identification of potential impairment indicators.

60.     The 2012 and 2013 operating losses in the Microelectronics business, as well as IBM's decision in early 2013 to sell the Microelectronics business, should have triggered impairment testing on the Microelectronics business. When IBM began looking in earnest for a buyer of Microelectronics in early 2013, it should have conducted impairment testing. When the segment suffered a loss of more than $700 million in 2013, following on a loss of more than $600 million in 2012, IBM should have conducted impairment testing. In accordance with GAAP, the carrying value of the long-lived assets associated with the Microelectronics business should have been impaired and reported no later than the quarter ended December 31, 2013—but it was not.

### B.  IBM's False Disclosures and Financial Reports

61.     Following the close of the markets on January 21, 2014, IBM issued a press release reporting its financial and operating results for the fourth quarter and full year ended December 31, 2013. In the release, the Company "announced fourth-quarter 2013 diluted

earnings of $5.73 per share, compared with diluted earnings of $5.13 per share in the fourth

quarter of 2012, an increase of 12 percent" and "[o]perating (non-GAAP) diluted earnings

[of] $6.13 per share, compared with operating diluted earnings of $5.39 per share in the

fourth quarter of 2012, an increase of 14 percent."

62.     The press release stated in part, quoting CEO Virginia "Ginni" Rometty:

> We continued to drive strong results across much of our portfolio and again grew
> earnings per share in 2013.... As we enter 2014, we will continue to transform our
> business and invest aggressively in the areas that will drive growth and higher
> value. *We remain on track toward our 2015 roadmap for operating EPS of at least
> $20,* a step in our long-term strategy of industry leadership and continuous
> transformation.

63.     In conjunction with the announcement, IBM held a conference call with

analysts and investors after the market close on January 21, 2014 to discuss earnings and

operations. Regarding earnings guidance for 2014, defendant fiduciary and CFO Schroeter

stated, in part:

> So I want to start out by saying that we continue to expect to deliver *at least $20 of
> operating EPS in 2015.* We'll talk about 2014 a little later, and you'll see that our
> view of 2014 keeps us on track to that objective.
>
> * * *
>
> As always, we're positioning our business for the future. And as I noted, we
> continue to expect to achieve *at least $20 in 2015 along the way.*
>
> * * *
>
> As we look forward to 2014, we'll continue our transformation, shifting our
> investments to the growth areas, and mixing to higher value. We'll acquire key
> capabilities. We'll divest businesses, and we'll rebalance our workforce as we
> continue to return value to shareholders.
>
> Our current view of all of this is included in our expectation of *at least* $18 *of
> operating  EPS  in  2014.* That's  up  10.5%  from  $16.2  in  2013.
>
> We'll see the benefits of the first quarter rebalancing action later in the year. As a
> result, we expect our first quarter EPS to be about 14% of the full year, reflecting
> the modest gain, workforce rebalancing charge, and continued impact from

currency. For these reasons, our first quarter skew in 2014 should be lower than our historical skew, which has been about 18% of the full year over the last few years.

And importantly, we expect to grow our free cash flow in 2014 by about $1 billion. That's faster than net income, even after absorbing another significant cash tax headwind, and growing capital expenditures. *All of this keeps us on track to our 2015 objective of at least $20 of operating EPS.*

64.      On February 25, 2014, IBM filed with the SEC an annual report on Form 10-K for the fourth quarter and full year ended December 31, 2013, which incorporated by reference the financial statements set forth in the 2013 Annual Report to Investors. In particular, the Annual Report stated that the consolidated financial statements were prepared in accordance with GAAP and included the following representations about IBM's accounting practices:

> *Long-lived assets, other than goodwill and indefinite-lived intangible assets, are tested for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.* The impairment test is based on undiscounted cash flows and, if impaired, the asset is written down to fair value based on either discounted cash flows or appraised values.

> Goodwill and indefinite-lived intangible assets are tested annually, in the fourth quarter, for impairment and whenever changes in circumstances indicate an impairment may exist. Goodwill is tested at the reporting unit level which is the operating segment, or a business, which is one level below that operating segment (the "component" level) if discrete financial information is prepared and regularly reviewed by management at the segment level.

65.      The financial statements in the 2013 Annual Report contained representations regarding the operations of IBM's Systems and Technology Segment. The Annual Reports stated that, for the Systems and Technology Segment: External Gross Profit was $5,120 and $6,903 in 2013 and 2012 (in millions), and Gross Profit Margin was 35.6% and 39.1%.  The Annual Report then stated:

> Systems and Technology's gross profit margin decreased 5.5 points in the fourth quarter of 2013 versus the prior year. The decrease was driven by lower margins in Power Systems (1.3 points), System x (1.2 points), Storage (0.6 points),

Microelectronics (0.5 points) and a decline due to revenue mix (2.2 points). Systems and Technology's pre-tax income decreased $768 million or 78.8 percent in the fourth quarter, and pre-tax margin decreased 11.7 points versus the prior year period.

66.    IBM did not disclose any losses or impairment in the Microelectronics business, which appeared based on IBM's public disclosures to have been profitable during 2013 for the Systems and Technology Segment, although with slightly lower margins. This was false, of course, because Microelectronics was actually a massive money-loser at that time. But IBM did not disclose that the Microelectronics business had any substantial negative impact on the unit's overall business.

67.    After the close of trading on April 16, 2014, IBM issued a press release announcing its financial results for the first quarter of 2014, ended March 31, 2014. For the 2014 first quarter, the Company reported diluted earnings of $2.29 per share and operating (non-GAAP) diluted earnings of $2.54 per share. CEO Rometty commented on the results, stating, in part:

> In the first quarter, we continued to take actions to transform part of the business and to shift aggressively to our strategic growth areas including cloud, big data analytics, social, mobile and security. . .
>
> As we move through 2014, we will begin to see the benefits from these actions. Over the long term, they will position us to drive growth and higher value for our clients.

68.    IBM held a conference call with analysts and investors following the earnings announcement on April 16, 2014. Regarding the earnings guidance for 2014, CFO Schroeter stated, in part:

> For the year, we expect to deliver *at least* $18 *of operating earnings per share for 2014.* This does not include any gain from the sale of our System x business to Lenovo because of the uncertainty of the timing and amount, but it will ultimately be included in our operating EPS results, and we'll update you later in the year.

Like always, we manage our business and allocate capital for the long term, and along the way, we still expect to deliver *at least $20 of operating EPS in 2015.*

\* \* \*

In terms of the $18, we said that we would get to at least $18. We said in the first quarter that we would do about 14% of that, and that's where we came in, at 14%.

\* \* \*

Given that quarterly phenomenon, a charge in the first quarter of this year but none the second versus the prior, we would think that the first half ... is going to look a lot like last year, and we'll probably get about 38% of our full year EPS done by the end of the first half.

And then when we look at the second half, we'll see consistent growth with what we need on a full year basis at 10.5, and given the transactional nature and the momentum in some of our businesses, we would say it would probably be a little bit faster in the fourth than in the third.

69.      The First Quarter 2014 10-Q also contained representations regarding the operations of IBM's Systems and Technology segment. The Quarterly Report stated that, for the Systems and Technology Segment, External Gross Profit was $645 and $1,003 in 2014 and 2013 (in millions), and Gross Profit Margin was 27% and 32.3%. The Quarterly Report then stated:

Systems and Technology's gross profit margin decreased 5.3 points in the first quarter of 2014 versus the prior year. The decrease was driven by a decline due to revenue mix as a result of less mainframe content (2.3 points), lower margins in Power Systems (1.7 points), Microelectronics (1.3 points) and Storage (0.9 points), partially offset by higher margins in System z (0.2 points) and System x (0.1 points).

Systems and Technology's pre-tax loss increased $255 million to a loss of $660 million in the first quarter 2014, when compared to the prior year. Pre-tax margin decreased 13.2 points in the first quarter versus the prior year period. Normalized for workforce rebalancing charges of $218 million and $3 million in the first quarter of 2014 and 2013, respectively, Systems and Technology's first quarter pre-tax income was a loss of $442 million compared to a loss of $402 million in the prior year, and the pre-tax margin declined 4.8 points.

70.      On July 17, 2014, IBM issued a press release announcing its financial results for its quarter ended June 30, 2014. For the 2014 second quarter, the Company

reported diluted earnings of $4.12 per share and operating (non-GAAP) diluted earnings of $4.32 per share. CEO Rometty commented on the results, stating, in part:

> In the second quarter, we made further progress on our transformation. We performed well in our strategic imperatives around cloud, big data and analytics, security and mobile . . . . We will continue to extend and leverage our unique strengths to address the emerging trends in enterprise IT and transform our business, positioning ourselves for growth over the long term.

71.     Following the earnings release, IBM held a conference call with analysts and investors to discuss its earnings and operations. During the conference call, CFO Schroeter made statements about the Company's earnings and outlook, stating, in part:

> Let me spend a minute on the first-half performance. The revenue performance for the half is very similar to the second quarter. Through six months we had double-digit revenue growth in strategic initiatives, stable performance in our core franchises, and the impact of some secular trends in parts of hardware and from the divested business.
>
> Looking at profit, we expanded gross margin 50 basis points, pretax margin by 70 basis points, and net margin by 50 basis points. All while shifting investment to key areas. Operating earnings per share for the first half were up 9.5%.
>
> * * *
>
> Systems and Technology revenue of $3.3 billion was down 11%. This is a significant improvement in the year-to-year performance compared to last quarter. The improvement was driven by system z, as well as sequential improvements in system x and storage. This, together with actions to align our structure to the demand profile, result[ed in] progress in stabilizing our profit.

72.     CFO Schroeter also spoke about IBM's 2014 earnings guidance, stating in part:

> As we look to the full year of 2014, we expect to deliver *at least $18 of operating earnings per share and we still expect to deliver at least $20 of operating earnings per share in 2015.* These are points along the way to delivering performance, and shareholder value over the long term.
>
> * * *
>
> In the second half, we see . . . our software revenue growth accelerating to mid-single digit. And we see our services profit growth of mid-single digit driven by productivity in the base. And then on STG . . . , we see that profit stabilization still.

So when I think about the second half, and how that plays out, as we said 90 days ago, ... I think EPS growth in the second half will be a little bit faster in the fourth than in the third. So kind of double-digit fourth quarter EPS and a single-digit third quarter EPS.

And bear in mind that single-digit EPS growth even in the third, because of seasonality kind of translates to, no more absolute EPS than what we got in the second.

73.     On July 29, 2014, IBM filed its Form 10-Q for the quarter ended June 30, 2014. The Quarterly Report stated that, for the Systems and Technology Segment, External Gross Profit was $1,773 and $2,383 in 2014 and 2013 (in millions), and Gross Profit Margin was 31% and 34.7%. The Second Quarter 10-Q also contained representations regarding IBM's Systems and Technology Segment stating, in part:

Systems and Technology's gross profit margin decreased 2.8 points in the second quarter of 2014 versus the prior year. The decrease was driven by lower margins in Power Systems (1.1 points), Storage (0.9 points), Microelectronics (0.8 points) and System x (0.8 points), partially offset by an improvement due to revenue mix (0.4 points). Gross profit margin for the first six months of 2014 decreased 3.7 points compared to the first six months of 2013. The decrease was driven by lower margins in Power Systems (1.3 points), Microelectronics (1.0 points) and Storage (0.9 points), and a decline due to revenue mix (0.7 points).

Systems and Technology's pre-tax income increased $166 million to $25 million in the second quarter and its pre-tax loss increased $89 million to $635 million for the first six months of 2014 compared to prior year periods. Pre-tax margin increased 4.3 points in the second quarter and decreased 2.8 points in the first six months versus the prior year periods. Second-quarter performance reflects a year-to-year reduction in workforce rebalancing charges of $202 million.

The company's focus for STG in 2014 is to stabilize the profit base and, after the first half of the year, the company is on track. The company will continue to make investments in this business to remain a leader in high-performance, high-end systems. In July, the company announced it will invest $3 billion over the next five years to tackle the challenges of the "post-silicon" era, demonstrating its commitment to innovation and to leading in the new era of enterprise IT.

74.     The subsequent October 20, 2014 revelations demonstrated that the statements made in its Annual and Quarterly Reports, earnings releases and on conference

calls during 2014 were materially false and misleading when made because they misrepresented and failed to disclose adverse facts.

75. The truth, which was known by IBM and its senior officers but concealed from the investing public and Plan participants during the Class Period, was that:

(1) IBM's Microelectronics business incurred a loss of $638 million in 2012, $720 million in 2013, and $619 million in the first three quarters of 2014;

(2) the long-lived assets of IBM's Microelectronics business had little or no value;

(3) IBM's operating results were materially inflated due to the improper failure to timely report a $2.4 billion impairment in the value of the assets of the Microelectronics business;

(4) IBM and its officers lacked a reasonable basis for their representations that IBM was on track to achieve $18 per share in operating EPS in 2014;

(5) IBM's financial statements were presented in violation of GAAP and were materially false and misleading;

(6) IBM's annual and quarterly reports on Forms 10-K and 10-Q failed to disclose then-known events or uncertainties associated with IBM's Microelectronics business;

(7) IBM's disclosure controls and internal controls over its financial reporting were materially deficient;

(8) IBM's senior officers certifications about its disclosure controls and internal controls over its financial reporting were materially false and misleading; and

(9) IBM and its senior officers lacked a reasonable basis for their positive statements about the Company, its business prospects, and future operating performance.

## C. IBM Reveals the Truth

76. During the Class Period, IBM and its senior officers concealed a $720 million loss in the Microelectronics business in 2013 and a $619 million loss for the first three quarters of 2014, and they failed to timely record an impairment in the value of IBM's

long-lived assets of the Microelectronics business. As a result, IBM's reported earnings and 2014 earnings guidance during the Class Period were artificially inflated and materially false and misleading—and IBM's stock price was consequently artificially inflated in value as well.

77.     On October 20, 2014, IBM issued startling disclosures that surprised investors and analysts and revealed the extent of IBM's misrepresentations and accounting misconduct. Before the opening of trading that day, IBM and GlobalFoundries jointly announced that they had entered into a Definitive Agreement under which GlobalFoundries would acquire IBM's global commercial semiconductor technology, "including intellectual property, world class technologists and technologies related to IBM Microelectronics" for cash consideration of **$1.5 billion *to be paid to GlobalFoundries by IBM***. Under the agreement, GlobalFoundries would continue to supply semiconductors to IBM.

78.     The press release also announced that "IBM will reflect a pre-tax charge of $4.7 billion in its financial results for the third quarter of 2014, which includes an asset impairment, estimated costs to sell the IBM microelectronics business and cash consideration to GlobalFoundries."

79.     Also on October 20, 2014, IBM issued a press release announcing its financial results for the third quarter ended September 30, 2014, reporting sales of $22.4 billion on continuing operations (excluding the Microelectronics business), down 4% from the third quarter of 2013, and operating profits of $3.68 per share, down 10% from the third quarter of 2013.

80.     IBM also reported that its gross profit margin from continuing operations on an operating basis was 49.2%, down 90 basis points from the third quarter of 2013. Total revenue from IBM's Systems and Technology segment, which included semiconductor operations, declined 15%.

81.     The earnings release quoted CEO Rometty, who stated, "We are disappointed in our performance."

82.     The release also stated the following regarding discontinued operations:

The loss from discontinued operations in the third quarter includes a non-recurring pre-tax charge of $4.7 billion, or $3.3 billion, net of tax. The charge includes an impairment to reflect fair value less estimated costs to sell the Microelectronics business assets, which the company has classified as held for sale at September 30, 2014. The charge also includes other estimated costs related to the transaction, including cash consideration expected to be transferred to GLOBALFOUNDRIES of approximately $1.5 billion. The cash consideration is expected to be paid to GLOBALFOUNDRIES over the next three years and will be adjusted by the amount of the working capital due by GLOBALFOUNDRIES to IBM, estimated to be $0.2 billion. In addition, discontinued operations include operational net losses from the Microelectronics business of $0.1 billion in both the third quarter of 2014 and the third quarter of 2013.

83.     During the October 20,2014 third quarter earnings conference call, defendant fiduciary and CFO Schroeter stated the following regarding the Microelectronics business:

[T]he 2013 OEM revenue associated with the divested business was $1.4 billion, and *our STG segment included pre-tax losses for this business of over $700 million.* This is being reported as a discontinued operation. In the third quarter, [discontinued operations] will include both losses from the ongoing operations of about $90 million after tax, and a one-time after-tax charge of $3.3 billion associated with the transaction. The transaction had no impact to free cash flow in the third quarter.

84.     Schroeter also reduced 2014 guidance during the call, withdrawing the $20 operating EPS roadmap for 2015 and conceding that, rather than $18 EPS as promised in

July, "full year 2014 Operating EPS [would] be down between 2 percent and 4 percent, that's off last year's comparable base of $16.64."

85.     During the question-and-answer portion of the call, analysts responded with surprise to the news. Goldman Sachs analyst Bill Shope observed, "Obviously there's a lot of new info here," and Barclays analyst Benjamin Reitzes commented, "We've just had obviously a major setback here."

86.     Brian White, a Cantor Fitzgerald analyst, asked about the newly released details on Microelectronics losses: "I just wanted to be clear. What did the chip business lose in 2013 and what are the expectations for loss in 2014?" Schroeter responded, in part, "[in] 2013 we had a loss of $700 million on a pretax basis. And 2014 is basically flat to what we saw in 2013."

87.     *The Wall Street Journal* also published commentary on the news, observing that it was a hit specific to IBM. The *Journal* stated that IBM's "results stood in contrast to Apple Inc., which on Monday posted a 13% profit increase on strong September sales of its larger-screen iPhones."

88.     In reaction to the disclosures, IBM's stock price declined more than $12.00 per share to close at $169.10 per share on October 20, 2014 on high trading volume.

89.     On October 28, 2014, IBM filed its Form 10-Q for the quarter ended September 30, 2014. The Form 10-Q reported that, during the quarter, IBM wrote off the entire value of the assets of the Microelectronics business:

> In the third quarter, the company recorded a pre-tax charge of $4.7 billion related to the sale of the Microelectronics disposal group, which was part of the Systems and Technology reportable segment. The pre-tax charge was recorded to reflect the fair value less the estimated cost of selling the disposal group including *an impairment to the semiconductor long-lived assets of* $2.4 *billion,* $1.5 billion representing the cash consideration expected to be transferred to

GLOBALFOUNDRIES and $0.8 billion of other related costs. The asset impairment was reflected in property, plant and equipment, net and the other costs of disposal were reflected in other accrued expenses and liabilities and other liabilities in the Consolidated Statement of Financial Position at September 30, 2014.

90.     As a result of the false statements during 2013, IBM's securities traded at artificially inflated levels during the Class Period. When IBM revealed the true value of its Microelectronics business and improper accounting practices, the price of IBM common stock fell to a value that was approximately 14% less than its Class Period peak.

91.     Prior to the start of the Class Period, IBM should have reduced the reported value of its Microelectronics business in its financial statements. Instead, IBM misrepresented the value of the Microelectronics business, materially inflating earnings and rendering earnings guidance materially misleading.

92.     Rather than properly testing and impairing the assets, during the Class Period, IBM assigned an approximately $2.4 billion carrying value to the Microelectronics long-lived, property, plant, and equipment assets reflected in the financial statements it filed with the SEC and issued to investors, even though it knew the assets were worthless.

93.     The Microelectronics business lost $700 million in 2013, and it was on track for a similar loss in 2014. It was obvious that the Company would not be able to sell the Microelectronics business for more than $1 billion based only on the business's engineering expertise and intellectual property.

## VI.     THE PLAN'S FIDUCIARY BREACHES: FIDUCIARY ACTIONS SHOULD HAVE BEEN TAKEN

94.     Throughout the Class Period, defendants knew or should have known the truth about these misleading statements and IBM's failures to disclose the truth about its Microelectronics business. Defendants knew or should have known that IBM's public SEC

filings were materially false and misleading, and that IBM's stock price did not reflect material information about the Company. They knew or should have known that this information was enormously material to Plan participants and investors, and that the truth was not disclosed to the public. They further knew that IBM and Schroeter misled the public in its SEC filings, earnings releases and conference calls, on which the public was relying. Yet defendants did nothing to act upon that knowledge to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties.

95.     Defendant Schroeter was the CFO, a Sarbanes-Oxley co-signatory of IBM's SEC filings, and, indeed, was the person who actually made many of IBM's misleading statements that artificially drove up the Company's stock price. He was or should have been aware of the Microelectronics business's 2012 and 2013 performance, and, upon information and belief, he was directly involved in the efforts by Goldman Sachs to sell the failing business. Thus, he should have recognized that the Microelectronics business had performed terribly in 2012 and 2013, but that this performance had gone undisclosed. He should have known the expected performance of the business in 2014, and that this poor performance was also going undisclosed. And he should have been sufficiently familiar with the requirements of GAAP to know that the proper impairment and reporting with respect to the Microelectronics had not occurred as required by GAAP. Given his involvement in the efforts beginning in early 2013 to sell the Microelectronics business, he should have known that there was a better than 50-percent chance that the business would be sold, making the need for impairment testing in 2013 all the more critical under GAAP. Arguably, no person at IBM was more centrally involved in the Company's misrepresentations regarding its Microelectronics business during the Class Period than

32

Schroeter, and no person was better positioned to understand the effect that these misrepresentations were having on IBM's stock price.

96.     Defendant Weber, as GC, would also have played a central role in the preparation of IBM's financial reporting. He was responsible for ensuring that that reporting complied with the federal securities laws, which of course require truth and accuracy in all financial reporting. Unless Weber completely abdicated his responsibilities as GC during the Class Period, it is reasonable to infer that he was aware—or at least that he should have been aware—of IBM's false financial reporting, and thus its artificially inflated stock price.

97.     Defendant Carroll, as the senior-most accounting officer at IBM, should also have been centrally involved in the preparation of these financial statements, including with respect to what was and was not disclosed regarding the performance and value of the Microelectronics business. Carroll in particular should have been attuned to the fact that an impairment of the business's long-lived assets should have been part of the accounting—and that it was not during the Class Period.

98.     Whether any of the defendants had a motive for allowing IBM's misrepresentations in its accounting regarding Microelectronics is irrelevant. Each defendant knew or should have known that Microelectronics' long-lived assets required impairment testing by year-end 2013 given the segment's catastrophic losses in 2012 and 2013. Each defendant knew or should have known that IBM's efforts beginning in early 2013 to sell the Microelectronics business, including IBM's retention of Goldman Sachs to find a buyer, demonstrated a better-than-50-percent chance that the segment would be disposed of, a likelihood that also necessitated impairment testing. And, because each

defendant was centrally responsible for IBM's financial disclosures, each defendant knew or should have known that Microelectronics' losses were hidden from the public, and that the value of its assets was wildly overstated because no impairment testing had taken place and no impairment had therefore been timely recorded. Therefore, each defendant knew or should have known that these facts regarding the Microelectronics business, because they were concealed from the public, enabled IBM's stock price to trade at an artificially high value, and, sure enough, when the truth about Microelectronics finally did emerge, IBM's stock price dropped as that artificial inflation value was wiped away.

99.     Each of these individuals had a front row seat for IBM's misrepresentation of its Microelectronics business. And each was also a fiduciary of the Plan, charged under ERISA with ensuring the prudence of Plan investments, well aware that IBM stock was a popular Plan investment, and also aware that that popular investment had become an imprudent one. Yet none of them took a single action to protect Plan participants from that imprudent and ultimately harmful investment.

100.    As Plan fiduciaries, defendants were required to investigate and monitor whether IBM's stock was a prudent retirement investment and to issue corrective disclosures about IBM. Notwithstanding these duties, defendants did nothing to protect the retirement savings of the Plan participants to whom they owed fiduciary duties from harm as the result of the artificial inflation of IBM's stock price.

## A.  Corrective Disclosures Should Have Been Made And Would Not Have Caused "More Harm Than Good"

101.    The Committee had the power to disclose the truth to the public and correct the artificial inflation, a power that it shared with the Plan Administrator, defendant Carroll. Indeed, defendants Schroeter and Weber, as CFO and GC, respectively, were uniquely

situated to fix this problem inasmuch as they had primary responsibility for the public disclosures that had artificially inflated the stock price to begin with. They could have stopped those misrepresentations from ever happening, or at least they could have issued truthful or corrective disclosures much earlier to cure the artificial inflation and to make its stock a prudent investment again for the Plan.

102. Disclosure of the truth to the public was necessary to correct the artificial inflation, and to prevent both present and future harm and damage to the Plan. Defendants' disclosure would have ended the artificial inflation in IBM's stock price, which was damaging all purchasers through the Plan who paid excessive prices for the stock.

103. During the Class Period, the Fund purchased $110,826,417 worth of IBM stock in 2014, most of which was likely purchased during the Class Period. In other words, as much as $100 million or more worth of shares of IBM stock were bought at artificially inflated prices. Even if defendants thought that the artificial inflation of IBM's stock was somehow benefitting Plan participants who managed to sell at inflated prices,[1] they should have compared that benefit to the harm being suffered by Plan participants who were buying at artificially inflated prices, and concluded that more harm than good to the Plan could not possibly be done by continuing to let the artificial inflation go uncorrected.

104. For example, if defendants had tried to effectuate corrective public disclosure near the very beginning of IBM's concealment—at the beginning of the Class Period—almost all of the artificial inflation of IBM's stock price that occurred could have been avoided, and virtually no Plan participants who purchased shares of the Fund would

---

[1] Allowing Plan participants to benefit from sales at artificially inflated prices would arguably call into question defendants' adherence to the securities laws' prohibition on insider trading in any event.

have been harmed. But as the artificial inflation went on and on, more and more Plan participants made purchases at artificially high prices, and thus the harm to Plan participants steadily increased. As two experts framed the issue:

> If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error. However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, *the inflation will be overstated for a much larger group of purchasers*.

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 911 (1990) (emphasis added).

105.   Defendants also needed to act to prevent future harm and damage to the Plan's investment in IBM stock. This position was at risk from a large stock price correction when the public learned the truth and realized that IBM management had concealed the true value of Microelectronics. As time passed, IBM stock price inflated further and the size of the scandal grew, making the eventual collapse worse. The concealment put the Plan's holding of IBM stock at risk for a serious and lasting decline in value, and hurt management's credibility and the long-term prospects of IBM as an investment.  This significant harm to the Plan could have been prevented or mitigated by timely disclosure.

106.   This reputational damage is not merely theoretical. Economists and finance experts have conducted numerous empirical studies on the matter, and concluded "the reputational penalty" a company suffers because it perpetrates a prolonged concealment of the truth is significantly greater than any regulatory fines or other penalties that it may

occur—in fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system." Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008). Moreover, "*[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 .… [of which] $2.71 is due to lost reputation*." *See id.* (Emphasis added.) And this reputational damage, unsurprisingly, increases the longer the concealment goes one. *Id.*

107.  Defendants cannot argue that the federal securities laws prevented them from making truthful disclosure. In this situation, ERISA and the federal securities laws compelled defendants to take exactly the same action—tell the truth and correct the inflated stock price. No law or duty required them to conceal or prevent the disclosure of the truth— quite the opposite.

108.  This also means that defendants knew—or should have known—that disclosure of the truth was going to happen one way or another. IBM had spent almost two years actively seeking a buyer for the Microelectronics business. It was more likely than not that the segment would be sold, which defendants knew (or should have known). When Microelectronics was finally sold, the truth about its near-worthless assets and ongoing massive losses would likely have to be disclosed to the public. In other words, IBM's misrepresentations about Microelectronics were a ticking time bomb. Eventually, that bomb would go off and the truth would have to be disclosed, bringing the artificial inflation of IBM's stock to a painful end. If defendants were really considering what action would do Plan participants more harm or good, they should have considered that, given the

likelihood of the truth coming out about Microelectronics' real value, a stock price correction was unavoidable—the only relevant question for them should have been whether it would be better for Plan participants for the correction to occur sooner or later. Given the overwhelming evidence and research showing that later disclosure of the truth leads to a harsher price correction, defendants should have recognized that earlier disclosure was by far the less harmful option than the one that they did choose—namely, waiting for the sale of Microelectronics to be announced and the truth to come out on its own. This decision by defendants led to a much harsher price correction than was necessary, one that investors, including Plan participants, are still suffering the consequences of today.

109.   Common sense should have reminded them that no corporate concealment of misconduct lasts forever; there is always a day of reckoning. Thus, the question was not *whether* they could prevent a stock drop due to IBM's concealment of the truth, but *when* that drop would occur, and how severe it would be. Defendants should have recognized that the sooner they acted, the less severe the drop, and, therefore, the less harm to the Plan and to Plan participants.

110.   Defendants could not have reasonably believed that effectuating truthful, corrective disclosure would do "more harm than good" to the Plan or its participants.  First and foremost, the participation of the fiduciaries in the concealment of Microelectronics's true value which deceives the Plan participants runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed. At a minimum, defendants had the fiduciary obligation to disclose the truth to correct the artificial inflation.

111.    Truthful disclosure was also needed to prevent worse future harm to the Plan and IBM's stock price. Defendants may argue that they were concerned that correcting the artificial inflation would temporarily lower the stock price, but that concern should not have deterred disclosing the truth. Every artificial inflation of publicly held stock in history, when corrected, has resulted in a temporary drop in the stock price; that is an inherent quality of efficient markets. But, in virtually every such case, the longer the artificial inflation persists, the harsher the correction tends to be. Defendants should have disclosed the truth sooner rather than later to minimize the ongoing harm (to prevent further artificial inflation and purchases at excessive prices), as well as worse future damage to IBM's stock price.

112.    Defendants' inaction towards the artificial inflation caused far greater harm to the Plan that is substantial and concrete, and not merely theoretical. The Plan was a purchaser of over $100 million dollars' worth of the Fund from additional employee contributions. The longer that IBM's concealment went on, the more Plan purchasers bought at artificially inflated prices, and the size of the harm to each purchaser increased over time as the stock price inflated. As a result, IBM stock had farther to fall when the truth inevitably came out, so that the purchasers were hurt even worse as the result of choosing to invest in IBM stock.

113.    The Plan holders of IBM shares suffered greater harm and damage in this same manner from defendants' failure to end the artificial inflation. While they held IBM shares over the period of time when the stock price was artificially appreciating in value, they were deceived by the false growth.  They suffered greater losses when IBM's stock price corrected, and fell further due to the loss of management credulity. They also were

deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place.

114.    Additionally, by the very same mechanism that IBM could have used to make corrective disclosures to the general public under the federal securities laws, it could also have made disclosures to Plan participants, because Plan participants are, after all, part of the general public. Defendant Schroeter made public statements during IBM's conference calls, and along with defendant Weber, certified IBM's annual reports, so they both could have effected the necessary truthful disclosures. Defendants did not have to make a "special" disclosure only to Plan participants, but could simply have made one corrective disclosure to the world and thereby simultaneously satisfied its obligations under the federal securities laws *and* ERISA.

115.    And, even if defendants determined that disclosure was not required by the securities laws, disclosure was certainly not prohibited by them. As discussed above, the truth's emergence, and thus IBM's stock price correction, was inevitable. Thus, defendants, in weighing harm versus good, should have concluded that even a disclosure not required by the securities laws would, in this case, be less harmful than waiting for the disclosure to happen through some other mechanism—in this case, the likely sale of Microelectronics and concomitant disclosures that sale would require.

116.    Indeed, earlier disclosure by IBM would have affirmatively benefitted the Plan and its participants, as well as mitigated the harm. With the truth about IBM's misevaluation of its Microelectronics business and inflated revenues and earnings, Plan participants could properly evaluate the Fund versus their other investment alternatives for

their retirement savings. Plan participants considering new purchases with their annual contributions could select healthier, prudent investment options such as diversified mutual funds which outperformed IBM stock during the Class Period. And over the long term, the failures to act by the Plan fiduciaries to expose the concealment of the truth is likely to have a chilling effect on future purchases of the Fund by Plan participants, whose trust in their employer is inevitably eroded by this malfeasance. Such an effect constitutes a net harm to the Plan.

## VII.   CLASS ACTION ALLEGATIONS

117.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held the IBM Company Stock Fund at any time between January 21, 2014 and October 20, 2014, inclusive.

118.   Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

119.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are over 196,000 members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by IBM or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

120.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

121.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     a.  Whether defendants each owed a fiduciary duty to the Plan, to plaintiffs and to members of the Class;

     b.  Whether defendants breached fiduciary duties owed to the Plan, to plaintiffs and to members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

     c.  Whether defendants failed to provide sufficient material disclosure to any and all Plan fiduciaries;

     d.  Whether defendants violated ERISA; and

     e.  The extent to which Class members have sustained damages and the proper measure of those damages.

122.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs and the other members of the Class each sustained damages or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

123.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans. Plaintiffs have no interest antagonistic to or in conflict with those of the Class.

124.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution

of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

125.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

126.    Plaintiffs also bring this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

## COUNT I
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Against All Defendants)

127.    Plaintiffs incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

128.    At all relevant times, as alleged above, all defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

129.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.

Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of such investments being imprudent.

130.   A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

131.   Defendants' duties of loyalty and prudence also obligate them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

132.   Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, defendants knew that the Fund had become an imprudent investment for Plan participants' retirement savings because there was false and misleading

material information given to Plan participants and the public about the stock that artificially inflated its value.

133.    Accordingly, defendants should have taken appropriate responsive action by effectuating disclosures that would have corrected the stock price and rendered the Fund a prudent investment again. As such, between January 21, 2014 and October 20, 2014, Plan participants could not appreciate the true risks presented by investments in IBM's stock and, therefore, could not make informed decisions regarding their investments.

134.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiffs and other Plan participants, suffered foreseeable damage to or lost a significant portion of their retirement investments. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for:

A.    Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiffs as class representatives, and determining that plaintiffs' counsel satisfies the prerequisites of Rule 23(g);

B.    Declaration that defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.    An Order compelling defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, to restore to the Plan all

profits defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made if defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining defendants from any further violations of their ERISA fiduciary obligations;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

G.      An Order that defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in the IBM Company Stock Fund in proportion to the accounts' losses attributable to the decline in the price of its stock or the value of investment in alternative options under the Plan.

H.      Awarding the Plan or Plan participants rescission or money damages including pre-judgment interest;

I.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

K.      An Order for equitable restitution and other appropriate equitable monetary relief against defendants.

L.      Such other and further relief the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

**DATED:** May 10, 2019

By: _/s/ Samuel E. Bonderoff_
   Samuel E. Bonderoff

Jacob H. Zamansky
James Ostaszewski
**ZAMANSKY LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
_samuel@zamansky.com_

ATTORNEYS FOR PLAINTIFFS